# BUNKER v. UNION PACIFIC RAILROAD COMPANY.

No. 2130. Decided March 15, 1911 (114 Pac. 764).

1. MASTER AND SERVANT—INJURIES TO SERVANT—DEFECT IN LOCOMO-
TIVE—EVIDENCE. In an action by a brakeman to recover for
injuries alleged to have resulted from a defect in the brakes
on the engine, by reason of which the engineer was unable to
stop the engine so as to avoid injury to plaintiff, evidence *held*
insufficient to show that the brakes were defective. (Page 583.)

2. APPEAL AND ERROR—HARMLESS ERROR—INSTRUCTIONS. In an ac-
tion by a brakeman against a railroad company for injuries, an
·instruction presenting the last clear chance rule, though errone·
ous in predicating plaintiff's right of recovery on his showing
that he was "himself in the exercise of due care," was not
prejudicial, where the evidence clearly showed that plaintiff's
injury resulted from the negligence of his fellow servants. (Page
586.)

3. MASTER AND SERVANT—INJURIES TO SERVANT—INSTRUCTIONS—
LAST CLEAR CHANCE. In an action by a brakeman for injuries
alleged to have resulted from the inability of the engineer to
stop the engine owing to defects in the brakes, an instruc·
tion that, if the braking apparatus was defective and that after
plaintiff fell from the pilot, the engineer received a stop signal,
and that thereupon the engineer endeavored to obey it, and that
he was unable to stop the train in time to prevent injury to
plaintiff's arm because the braking apparatus was defective,
or out of repair, and if the braking apparatus had been in
proper condition the engineer would have been able to stop,
and would have stopped, in time to avert the injury, then the
condition of the braking apparatus was the proximate cause
of the injury, and, if the evidence shows that such condition
of the braking apparatus was due to negligence of defendant,
the plaintiff, "if shown to have been himself in the exercise of
due care," is entitled to recover, was an instruction on the last
clear chance doctrine, and was not rendered misleading by the
use of the quoted words, since such words referred to plaintiff's
conduct after he fell from the pilot, and not to his previous
conduct in placing himself in a position of danger on the pilot.
(Page 589.)

4. MASTER AND SERVANT—INJURY TO SERVANT—PROXIMATE CAUSE.
In an action by a brakeman for injuries by being run over by
an engine after falling from the pilot of the engine, evidence
*held* not to warrant a finding that the defect in the braking
appliances on the engine was the proximate cause of the injury.
(Page 590.)

5. MASTER AND SERVANT—INJURIES TO SERVANT—CONTRIBUTORY NEG-
   LIGENCE. Where a brakeman violated a rule of the master in
   going upon the pilot of the engine with which he was working,
   he cannot recover for injuries resulting from his falling from the
   pilot and being run over by the engine, unless the injury could
   have been avoided after his peril was discovered. (Page 591.)

6. MASTER AND SERVANT—INJURIES TO SERVANT—CONTRIBUTORY NEG-
   LIGENCE. Where plaintiff, a brakeman, without any necessity
   therefor, rode on the pilot of the engine with which he was
   working, he was guilty of negligence and could not recover for
   injuries resulting from his falling from the pilot and being
   run over by the engine. (Page 592.)

7. MASTER AND SERVANT—INJURIES TO SERVANT—CONTRIBUTORY NEG-
   LIGENCE. Where a brakeman, without necessity therefor, rides
   on the pilot of the engine with which he is working, and such
   act is not only negligence, but is in violation of a rule of his
   employer, the employer owes him no higher duty than he owes
   to a trespasser. (Page 593.)

8. MASTER AND SERVANT—INJURIES TO SERVANT—APPLIANCES—DUTY
   OF MASTER. The master's duty in respect to appliances for his
   servants is satisfied, where he provides appliances that are
   suitable and in such condition that his servants can, with
   reasonable safety to themselves, perform the duties required of
   them. (Page 593.)

9. MASTER AND SERVANT—DUTY TO SERVANT—INJURY TO SERVANT.
   The master must exercise due care to prevent injury to an
   offending servant after his perilous position is discovered, but
   he cannot be held negligent because he has not prepared to
   obviate every injury that may result from extraordinary
   emergency, brought about by the violation of the master's
   rules. (Page 594.)

STRAUP, J., concurring in result.

APPEAL from District Court, Third District; *Hon. M. L. Ritchie,* Judge.

Action by Fred Bunker against the Union Pacific Railroad Company.

Judgment for defendant. Plaintiff appeals.

AFFIRMED.

*Powers & Marioneaux* for appellant.

*P. L. Williams, Geo. H. Smith* and *Frank L. Nebeker* for respondent.

FRICK, C. J.

Appellant brought this action to recover damages for personal injuries which he alleged were caused through the negligence of the respondent while apppellant was in its employ as a brakeman in the state of Wyoming.

The acts of negligence are given in the abstract in the following language: "That on the 31st day of August, 1908, the defendant had carelessly and negligently failed and omitted to provide a sufficient footboard on the engine and had carelessly and negligently suffered and permitted the air pump to be in such condition that it leaked and supplied an insufficient quantity of air for the operation of the air brakes, and carelessly and negligently failed to have the triple valve on the engine in good order, and permitted the triple valve to be out of repair, in consequence whereof the drive (wheel) brakes on the engine would not release, and carelessly and negligently failed to have.the brake rigging on the tender in proper condition; that the same was so loosely adjusted that the application of air did not result in sufficient friction, and carelessly and negligently failed to have the coach attached to said train connected with the air brake."

It is further alleged that on the day aforesaid, while appellant was engaged in the discharge of his duties as brakeman on a certain train and engine, by reason of respondent's failure to "equip the engine with a sufficient footboard, and while the train was running at three miles an hour, he fell from the engine to the ground and was pushed along by the engine; that a signal was given to the engineer to stop; that the engineer could have stopped within a distance of ten feet, but by reason of the carelessness and negligence of defendant as before alleged, the engineer was unable to stop the train, and plaintiff was pushed along upon the ground by the engine after the signal to stop, and after the engineer could and would have stopped, except for the carelessness and negligence of defendant aforesaid, until plaintiff was pushed to a point where his arm came in contact with the switch, and his arm was so mangled and torn by the wheels that it was necessary to amputate the same."

38 Utah—37

The respondent, in addition to certain denials, interposed affirmative defenses, substantially as follows: (1) That the injuries to appellant resulted from an accident which was caused by his own wrongful and negligent acts and omissions; (2) that the accident occurred in the state of Wyoming, and that at the time of the accident, and when this action was commenced, the common law of England in actions of this character was in force in that state; (3) that, if the injuries to appellant were caused or contributed to by the carelessness of any person other than hismelf, such carelessness and negligence was the act of a fellow-servant of appellant; and (4) that the risk of injury was assumed by him.

The alleged negligence respecting the failure to provide the engine with a footboard, that the triple valve was out of order, and that the coach which was a part of the train was not connected with the air is of no practical importance upon this appeal, and hence we shall not refer to them, except incidentally in connection with other matters.

Upon the other two issues, the facts developed at the trial were to the effect that on August 31, 1908, appellant was in the employ of respondent as rear brakeman on a train which was operated between Rock Springs and Superior, Wyoming, via Thayer Junction, which was a station on the main line, from which a branch line was constructed and operated to reach the coal mines at Superior. Appellant, prior to the accident, had been in the employ of respondent for about two years as brakeman, but had been braking on the particular train and line for about a week only. The train in question usually would start from Rock Springs each morning and would be run to Thayer Junction, and at that point would usually pick up empty cars to be taken to the coal mines at Superior, to be there loaded with coal, and when so loaded to be transported over the branch line back to Thayer Junction for distribution over the main line. The train crew were engaged in handling the train for the purpose aforesaid when the accident occurred. Sometimes cars loaded with merchandise would be taken to the coal mines at Superior, but the train was being operated principally

to take the daily output of coal from the coal mines to Thayer Junction for the purposes aforesaid. The train returned to Rock Springs every evening, where it and the train crew remained over night.

On the morning of the day last above stated a train, consisting of an engine, tender, water car, and combination coach, left Rock Springs at about seven thirty o'clock for Thayer Junction. The train was manned by a crew of six persons, namely, a conductor, an engineer, a fireman, and three brakemen, including appellant. When the train had arrived at Thayer Junction, some switching was necessary before starting out on the branch line to Superior. The switching, so far as it had progressed before the accident, consisted of switching the train from the east-bound main line over what is called the cross-over track to the west-bound main line. The main line at .this point consisted of a double track. When the train was switched from the east-bound to the west-bound main line, it had to be switched over what is designated a cut-off track, in order to get the train on to the branch line leading to Superior. To accomplish this, all of the switches had been ."lined up," so that the train could pass from the main line over the cut-off to the branch line. At this time appellant was standing by the side of the switch at the end of the cross-over track, somewhat ahead of the engine, and signaled the engineer to move ahead over the cut-off track on to the branch line. The engineer, in response to appellant's signal, applied steam, and the train consisting of an engine, tender, water car, and combination coach, moved forward, and when the engine had arrived at the point where appellant was standing by the side of the track, and while the train was moving, as the evidence disclosed, at the rate of from three and one-half to five miles an hour, apppellant steped on to the pilot or cowcatcher, and in attempting to cross over from one side of the pilot to the other, as appellant puts it, "on a piece between two and one-half and three inches wide, by foothold gave way, and I fell." On cross-examination he said he did not know what caused him to slip; "I just slipped" and fell off the front end

of the pilot. The pilot passed over his body, and he became unconscious, and in that condition was pushed along under the engine for about thirty-six feet to another switch, while the engine and train moved about eighty to ninety feet from the point where appellant fell off the pilot before the train was stopped. When appellant fell off the pilot, he was seen by Mr. Hamilton, the head brakeman, who was about one hundred and fifty yards east from the point where appellant fell. Hamilton testified that he saw appellant fall off the pilot, and at once gave the engineer a violent stop signal. The engineer and fireman, however testified that the first signal Hamilton gave was only an ordinary stop signal, to which the engineer responded by making the ordinary service application of the air to stop the train, and that as soon as he realized that Hamilton was giving a violent stop signal the engineer at once made an emergency application of the air, and brought the train to a stop as soon as he could. We shall more fully refer to this matter hereafter. By the time the train was stopped, however, the engine and tender and about one-half of the water car which was attached to the tender had passed over appellant, and his arm was caught in the switch point before mentioned and was found to be mangled and crushed.

Appellant's main contention arises at this point. His counsel contend that if the braking appliances had been in good order the train could and would have been stopped in time to prevent appellant's arm from coming in contact with the switch point, and hence it would not have been crushed and mangled. That the injury to appellant's arm was not caused until he reached the switch point is a matter of inference, if not conjecture, merely. The evidence that the braking appliances were defective at the time of the accident is inferential, rather than direct. The facts upon which appellant relies, from which it could be inferred that the appliances were in a defective condition, are substantially as follows: Respondent kept a book at the roundhouse or repair shops at Rock Springs in which its engineers, including the engineer of engine No. 1674, which was the engine

in question, might enter their requests for repairs in case the engines required such. The entries would be made, if made at all, by the engineers when they returned their engines to the round-house at Rock Springs. The book was not produced at the trial for the alleged reason that it could not be found; but the appellant testified that he made a personal inspection of the same some time after the accident, and that he copied therefrom entries which are as follows: "8-29-1908. Engine 1674. Pack air valves all around. Fix tank brakes. Fix triple on engine so brakes will release." "Aug. 30. Put triple valve on engine 1674. Fix the tank brakes." "Aug. 31st. Put triple valve on engine. Fix tank brakes." "Tighten both steam head and air pump." Similar entries made on the first, second, and third days of September were offered in evidence, but were excluded by the court. The last entry admitted in evidence was not made until after the accident. We shall assume that the engineer made the foregoing entries. In connection with the foregoing, the conductor and Hamilton, the brakeman, who were called as witnesses for appellant, testified that the engineer after he had stopped the train, and when he was informed that appellant was under it and was injured, said: "I gave it all to her," meaning that he had applied all the air to the braking appliances to stop the train when the signal was given by Hamilton, and could not stop it sooner.

Appellant also produced a witness as an expert who testified that a train equipped as the train in question was, if the braking appliances were in good order and the train was moving at from three to five miles an hour, could and should have been stopped in from ten to twelve feet. He at first said in from three to four feet, but corrected this statement when his attention was directed to the real situation and condition the train was in. Appellant's witnesses, including the conductor and brakeman on the train in question, however, stated that they had started with the engine and train from Rock Springs on the morning of the accident; that they did some switching before the accident, and that the braking appliances had worked all right; that they re-

turned to Rock Springs immediately after the accident, to take appellant to the hospital, and thereafter went to Thayer Junction and from there to Superior, and from there made either one or two trips with a train of loaded coal cars to Thayer Junction; that there is a steep grade rising from Thayer Junction to Superior, which makes it absolutely necessary that all trains operated on that line be equipped with first-class braking appliances, which at all times have to be kept in good repair, and if not so kept the trains cannot be successfully operated. They all admitted that no repairs were made after the accident on the day it occurred, and that there was no trouble with the air brakes on that day, and that the train was controlled by the brakes as usual, and that they neither discovered nor knew of anything wrong with the engine or train or braking appliances, except that the train did not stop sooner at Thayer Junction in the morning when appellant fell off the pilot.

Upon the other hand, the engineer, fireman, and other witnesses, who appeared on behalf of respondent, in substance testified that the book entries were accounted for by reason of the fact that it was a daily occurrence that something about the engine or apliances required some minor repairs; that the triple valve had no effect whatever on the braking capacity of the air brakes, but was used only in releasing the drive-wheel brakes after using the same; that the air valve often required repacking; that the packing was to reduce the leakage from the pump; that if the pump leaked it would not necessarily affect the capacity of the air brakes, because the air pump merely pumped the air that was used in operating the air brakes into a tank of receiver, from whence the air was taken when the brakes were used, and, unless the leakage of the air pump was so great as to prevent the air tank from being filled to what is termed train pressure, the leakage of the pump had no effect on the effectiveness of the air brakes. It was also made to appear that engine No. 1674 is what is termed a compound engine, and that an engine of that type cannot be stopped in as short a distance as a single engine can be; that when Brakeman Hamilton

gave his first signal the engineer applied only the ordinary
air service; that immediately thereafter, when he under-
stood Hamilton's signal as a violent stop signal, the engineer
applied the emergency service of the air, but applied the
latter without first releasing the ordinary service, and in
doing so the emergency service did not immediately take
full effect.   Appellant's expert witness also admitted that
under the circumstances the emergency appliances might
not immediately take effect; but he insisted that the train,
nevertheless, should have been stopped before the switch
point was reached.

It was also shown that engine No. 1674 was put on the
run in the preceding June; that it was one of the best
equipped engines, so far as the air pump and the braking
appliances were concerned, and that it was in first-class
condition; that the branch line on which it was operated
required that the air pressure be very severe, and for that
reason the brakes on the combination coach were cut out
of service long before and at the time of the accident; that
this was done because the severe pressure on the brakes
owing to the light weight of the coach would lock the wheels
on the coach and thus cause them to slide on the rails;
that under such conditions the brakes are practically of no
effect in stopping a train.   This fact was also conceded by
appellant's expert.   It was also shown that by reason of the
wearing of the brake shoes there was more slack on the
tank brakes than there should have been, and hence the
order given to "fix tank brakes" before referred to.   This
slack, however, was shown to have affected some of the
wheels only, and, while it was contended by appellant's
witnesses that this would reduce the effectiveness of the
brakes, respondent's witnesses claimed that it did not have an
appreciable effect.   In this connection we remark that, in view
that all sides conceded that on the day of the accident, and
before and after it occurred, the brakes were effective and
responded   to every requirement in operating the
train as usual over the steep grade on the branch line,
the jury were fully justified in assuming that the

braking appliances at the time of the accident were not defective.

The respondent also introduced in evidence a rule, a copy of which appellant admits was in his possession during the time he was in respondent's employ, the material portion of which reads as follows: "Employees . . . are warned not to get on the front or rear of an engine or the end of a car as it approaches them, or to go between cars in motion to uncouple, open, close, or arrange knuckles or couplers, or follow other dangerous practices." Appellant admitted that there was no necessity for him to ride on the pilot; that he had no duty to perform at the switch east of the one he had turned to let the train pass until the train had entirely passed beyond the switch; that in order to discharge this duty the safe and proper course for him to pursue was either to wait until the train had passed him, and then walk over to the switch, which was less than one hundred and fifty feet distant, or to wait for the coach to pass him and board the rear end of the same, and then drop off at the switch when the coach passed it. This method he admitted would have been both practical and safe. Indeed, he admitted in his testimony that the method pursued by him was not the proper one. In answer to certain questions propounded to him on cross-examination, he said: "It is customary to get off on the opposite side (of the train), but I got off on that side, or was to get off on that side, but I didn't. Q. You departed from that custom and were attempting to get over on the side that the switch was on when you fell? A. Yes, sir."

Appellant further stated that during the week he worked on the branch line he had crossed over from one side to the other on the pilot. While there is some other evidence in the record both for and against the contentions of both parties, yet the foregoing statement substantially covers the controlling facts upon which the court submitted all of the issues presented by the complaint and answer to which we have referred to the jury. No exceptions were taken by either party in this regard. The court also instructed the

jury upon all of the issues; the instructions consisting of twenty-three in number. The jury found the issues in favor of respondent; hence this appeal.

Among other instructions, the court gave a request asked by the appellant, with the modification hereafter noted. The instruction requested, including the modification, is as follows: "If you believe from the evidence that the braking apparatus was defective or out of order, as claimed by the plaintiff, and that after the plaintiff fell from the pilot, the engineer received a stop signal, and that he thereupon endeavored to obey it, and that he was unable to stop the train in time to prevent injury to plaintiff's arm because the braking apparatus was defective or out of repair, as alleged, and you also believe that if the braking apparatus had been in proper condition the engineer would have been able to stop, and would have stopped, in time to avert the injury to the plaintiff's arm, then the condition of the braking apparatus was the proximate cause of plaintiff's injury; and if you find from the evidence that such condition of the braking apparatus was due to negligence upon the part of the defendant, the plaintiff, *if shown to have been himself in the exercise of due care,* is entitled to a verdict."

The modification consisted of the italicized words, to which the appellant excepted and now insists that the court erred in modifying the request, as aforesaid, to his prejudice. In this regard it is strenuously argued that in the absence of the modification of the instruction the jury were justified in finding, and might have found, for the appellant, instead of for the respondent. The foregoing argument is based on the contention that by the instruction the case was intended to be and was submitted to the jury on what is usually denominated the last clear chance doctrine. Counsel contend that since this doctrine is applicable to cases where the plaintiff is in law guilty of contributory negligence, and where the defendant has the opportunity to avoid, not only the prior negligence of the plaintiff, but also has a clear opportunity to avert the injury after discovering or knowing of plaintiff's peril, therefore the plaintiff's negligence is

fully spent, and the whole case rests on the defendant's
negligence. It is therefore contended that by the modifica-
tion appellant was deprived of this rule of law, and hence
the italicized portion of the instruction is erroneous. In
this connection appellant's counsel contend that under the
facts and circumstances of this case the jury were justified
in finding that respondent did not discharge its legal duty
in providing adequate and proper braking appliances, and
that it had disregarded its duty in suffering them to be
defective and out of repair at the time of the accident, by
reason of which the train could not be stopped in time to
prevent the serious injuries to appellant's arm. Counsel
contend that the modification of the instruction "is errone-
ous upon two grounds: First, . . . he (appellant) was
not under obligation to *show* that he was careful, but the
burden was on the defendant to show the contrary; and,
secondly, . . . the question of his care in riding on
the pilot was wholly immaterial, if the jury found the facts
as put in the instruction. The instruction of the court
deprived plaintiff altogether of the doctrine of 'spent negli-
gence,' as we find it laid down in the Teakle Case, or 'last
clear chance doctrine,' as it is generally called."

The contention, it seems to us, is plausible, rather than
sound. If it were conceded that the court committed techni-
cal error in modifying the instruction, yet, in view of all
the facts and circumstances of this case, we are clearly of
the opinion that the error, if any, was not prejudicial.
Counsel seem to overlook the fact that under the        **2**
undisputed facts of this case, and under the law in
force in the state of Wyoming, where the accident occurred,
the appellant and the engineer and fireman were fellow ser-
vants; that the court, without objection, instructed the jury
and told them that "the defendant would not be liable to
the plaintiff for any injury sustained by him as the result
of the negligence of any one or more of his fellow servants."
There was ample evidence from which the jury were justified
in finding that at least the engineer was negligent in not ob-
serving Hamilton's first danger signal, and in not immedi-

ately making an emergency application of the air to the brakes, and that this and nothing else was the proximate cause of the injury to appellant.

The testimony of the engineer and fireman on this point, as found in the bill of exceptions, is to the effect that they interpreted Hamilton's first signal as an ordinary stop signal merely, and for that reason, the engineer says, he merely made a service application of the air. The record on this point discloses that the engineer was questioned with respect to what he did after observing Hamilton's violent stop signal. Referring to what the engineer said, the record reads as follows: "I looked over the switch on the west-bound main (line) and stopped just a little ways from the switch; Mr. Bunker (appellant) threw the switch, gave me the signal to come ahead; I proceeded. The next thing I knew Mr. Hamilton, who was up and threw the switch at the end of the yard, gave me a stop sign—came over and gave me the usual stop sign, like that (indicating). I took that for a usual sign; I didn't apply my air, my emergency, because I didn't think it was necessary. Q. Did you apply any air? A. Yes, sir. Q. About how much? A. I made the service application, a reduction of about 10 pounds pressure. Q. Then what did you do? A. The engine was moving on all the time until Mr. Hamilton—he turned around and started towards me, and gave me a violent stop signal as hard as he could throw his arms. Then I applied the air in emergency. Q. Did the engine stop? A. The engine stopped. At the same time as Mr. Hamilton gave me the violent stop signal the fireman also gave me a violent stop signal, and I applied the air in emergency. . . . Q. At that time, or after you got this violent stop signal, did your engine come to a standstill? A. Yes, sir. Q. About at what point? A. I should judge—I didn't go very far— not over ten or fifteen feet. Maybe not so far."

In fixing the place where the engine stopped, the engineer agrees with all of the other witnesses. This testimony of the engineer is not disputed by any one, except in one particular, and that is that Hamilton's first signal was a violent

stop signal. The statement that the engine was stopped within a short distance after the engineer made the emergency application of the air is not questioned by any one. The only matter which, at first blush, seems in conflict with it is the statement that the conductor says the engineer made, which have already quoted, "I gave it all to her," meaning that he had applied the full air capacity to the engine when Hamilton first signaled. Assuming that the engineer made this statement, it in no way conflicts with his statement that, as soon as he interpreted Mr. Hamilton's signal as a violent stop signal, he did make the emergency application and stopped the train, just as he said he did. No doubt the train moved along after Hamilton's first signal and until he gave his second signal, and thus the train had in fact passed beyond the point of the switch, just as the witnesses all testified it did.

The jury were, however, justified in finding that the forward movement of the train after Hamilton's first signal was because the engineer only made an application of ten pounds pressure, and as soon as he did make the emergency application the train came to a stop, just as the engineer said it did. Indeed, this conclusion is reinforced by the testimony of both the conductor and Hamilton, who were witnesses for the appellant, by their statements that the braking appliances fulfilled every requirement on the day of the accident, both before and after it occurred. These witnesses admitted (and all of the evidence is to the effect) that these requirements were very severe, in that the braking appliances were required to and did control at last one, and probably two, train loads of coal that were transported down a steep grade of about three per cent. from the coal mines at Superior to Thayer Junction. If, therefore, the air and braking appliances were sufficient to control the train under such circumstances while being taken down a steep grade;—and all of appellant's witnesses admitted that they were sufficient for that purpose—how could a jury of fair-minded men have found that the air or braking appliances were insufficient to

control the train upon a level track, and when moving at a moderate rate of speed in the yards at Thayer Junction?

So long as the evidence offered by appellant stood alone, there were some facts from which it might have been inferred that the air and braking appliances might, in some respects, have been deficient, but when these inferences were met by the positive and undisputed evidence, which the jury had no legal right to ignore, there was practically no evidence upon which to base a finding to that effect. The only way open, therefore, for the jury was to find that the default for not stopping the train sooner was that of the engineer, of which appellant cannot and did not complain.

It may also be said that the condition which the court introduced into the instruction is sometimes found in instructions relating to the doctrine of last clear chance. In giving an instruction embodying this doctrine, the trial judge, in the case of *Louisville, etc., Ry. v. Hurt*, 101 Ala. 41, 13 South. 133, imposes the condition in the following words: "Provided plaintiff did all he could to prevent the accident and save himself from harm after he became aware of his peril." It is true that in the foregoing quotation the court referred to plaintiff's conduct "after he became aware of his peril," while in the instruction criticised by counsel in this case no such express limitation is made. It is for this reason that counsel insist that the jury may have assumed that the court referred to appellant's prior and spent negligence. We are of the opinion that in view of the whole charge the jury were not misled by what the court said, but understood the cautionary phrase to refer to appellant's conduct after he fell from the pilot, and not to his conduct in going thereon. True, the caution was wholly unnecessary and uncalled for under the circumstances, and thus, technically, erroneous; but, unless appellant was prejudiced in a substantial right, the judgment cannot be reversed for the alleged error in the instruction.

Respondent, however, contends that under the evidence the doctrine of the last clear chance did not arise, and that the court did not intend to, and did not, submit that doctrine

to the jury by the instruction complained of. We are constrained to hold, however, that by the instruction the doctrine was submitted, although this was not done in as clear a statement as it ought to have been. In referring to the doctrine or rule of the last clear chance, the author, in 1 Labatt, Mast. and Serv., section 327, says: "In any case of this description, the instructions given should be so worded as to indicate clearly the effect of the rule."

The respondent further insists that in view of appellant's conduct he cannot avail himself of the doctrine, because, under the undisputed evidence, it is apparent that respondent violated no duty it owed to appellant. Upon the other hand, appellant contends that the jury were justified in finding that the air and braking appliances were defective, or out of repair, and that if they had not been in that condition the train could have been stopped before appellant sustained the sever injury to his arm. We have already intimated how we regard the evidence with respect to the condition of the appliances. But, again, assuming that the condition of the appliances was the cause of the train not being stopped sooner, yet the evidence hardly warranted a finding that the defect in the appliances, if any, was the proximate cause of appellant's injury. In view of all the evidence, it is just as likely that appellant's arm was crushed almost immediately after the fall, and the engine passed over him, as it is that he was not seriously injured until he was caught in the switch. Upon this point the jury were fully justified in finding that the fact that the train was not stopped sooner was not the proximate cause of the serious injury to appellant's arm. Indeed, the evidence, in our opinion, would not support an affirmative finding that the injury to appellant would have been averted if the train had been stopped before it reached the switch, and unless this were true appellant cannot complain that the train did not stop sooner. But supposing that the injury to appellant's arm could have been averted but for the alleged condition of the air and braking appli-

ances, can he recover in this action in view of all the evidence?

It certainly must be conceded that appellant's conduct was wholly inexcusable. He not only violated a positive rule of his master, but, in view of all the facts and circumstances, he was guilty of that degree of negligence in going upon the pilot which would prevent a recovery as a matter of law, unless he may do so under the doctrine of the last clear chance. His counsel contend that he may recover under this doctrine, in view of the principles announced in *Teakle v. S., P. L. A. & S. L. R. Co.,* 32 Utah 276, 90 Pac. 403, 10 L. R. A. (N. S.) 486; *Little Rock, etc., Co. v. Morrison,* 69 Ark. 289, 62 S. W. 1045, and *Dortch v. Railroad,* 148 N. C. 575, 62 S. E. 616. The last case referred to is not in point, because the last clear chance doctrine was not involved and not submitted to the jury in that case. The case of *Little Rock, etc., Co. v. Morrison, supra,* is clearly distinguishable from the case at bar, and the justice who wrote the opinion was careful to distinguish that case from one where the plaintiff places himself into a position of danger in violation of some positive rule of law.

The Teakle Case referred to, decided by this court, is in principle like the last case referred to. The deceased, Teakle, had a right to pass over or on the railroad track at the point where the accident occurred; that is, he violated neither a rule of the company nor any of its property rights, nor any law, in doing so, and hence was not a wrongdoer. Not being a wrongdoer, it was held in that case that the company owed him the duty to exercise ordinary care for his safety and to that end to keep a lookout for him. It was accordingly held that it was a question of fact for the jury to say whether the company had discharged that duty after the negligence of the deceased was spent, and after he had been struck and rendered helpless by the moving train. True it was held in that case that the plaintiff could not recover, unless it were shown that the defendant could have avoided the serious injury resulting in Teakle's death after he was struck

by the train. In other words, while Teakle's own negligence in stepping on the track in front of the moving train prevented a recovery, yet, if the evidence showed that the servants of the company were negligent in not seeing Teakle in time to prevent killing him after he became helpless, then the company would be responsible for his death. This ruling was, however, based upon the fact, as already indicated, that Teakle had a right to pass along and over the tracks, and that his negligence did not consist in being on the track, but in stepping immediately in front of the moving train. We did not hold in that case that a wrongldoer could have recovered; but Mr. Justice Straup, who wrote the opinion, and who always exercises care and discrimination when stating legal propositions, took pains to show that Teakle was not a trespasser nor wrongdoer when he was struck by the moving train.

In this case however, the appellant did not only violate a positive rule of safety which he was bound to observe, but, independent of any rule, as a matter of law, he was wholly reckless and grossly negligent, in view of the fact that he had absolutely no excuse for attempting to ride on the pilot. To attempt this when there was no emergency was gross negligence, amounting to recklessness on his part, regardless of any rule. Upon this point the cases of *St. Louis, K. C. & C. R. Co. v. Conway,,* 156 Fed. 238, 86 C. C. A. 1; *Montgomery v. Railroad,* 109 Mo. App. 88-93, 83 S. W. 66, and *Chicago & A. Ry. Co. v. Bragonier,* 119 Ill. 51, 7 N. E. 688, are strictly in point. See, also, *Railroad Co. v. Jones,* 95 U. S. 439, 24 L. Ed. 506; *Young v. Boston & Me. Ry.,* 69 N. H. 356, 41 Atl. 268, and note to *Bist v. London, etc., R. Co.,* 8 Am. and Eng. Ann. Cas., p. 16.

In the Conway Case, *supra,* the brakeman got onto the pilot, just as appellant did in this case, and fell off and was injured, and the court there held that in doing so the brakeman's relation to the company became that of a wrongdoer or trespasser. In other words, the company owed him the duty it would owe to a trespasser, and no higher duty.

It is not necessary for us at this time to define the precise relation that the appellant sustained to respondent by reason of his conduct in having violated one of the rules which was promulgated to enhance his safety while in the discharge of his duties. Nor is it necessary to go to the extent that the court went in the Conway Case, *supra*.

In view of all the facts and circumstances, however, we are constrained to hold that the only duty respondent was under to appellant after he fell from the pilot was to provide appliances that were suitable and in such condition that appellant could, with reasonable safety to himself, have performed the duties required of him as a brakeman. See 1 Labatt, Mast. and Serv., section 7. If the appliances provided by respondent at the time of the accident responded to the foregoing requirements, and if they were reasonably safe and sufficient to accomplish what was intended they should in operating the coal train between Rock Springs and Thayer Junction, and between the last station and Superior in hauling coal and in doing the switch- and other regular work required from the train, then we think the respondent had discharged its full duty to appellant and its other employees. The legal duty imposed upon the master must necessarily depend upon whether his servant has obeyed the rules promulgated by the master for the protection of the servant. Can the master be held culpably negligent merely because his appliances are not such as will prevent an injury to a servant who has violated one of the master's rules of safety, in a case where the violation of the rules creates an extraordinary emergency which causes such injury? Has the master not discharged his full duty when he has provided appliances which are sufficient to meet all of the ordinary requirements of his business, and which will protect the servant while in the discharge of his duties, and while he is obeying the master's rules of safety? Must the master be prepared to meet every emergency that may be created by a servant in violating the master's rules, and

38 Utah—38

unless the master is so prepared, and his appliances are not such as will respond to every emergency of such a character, is he to be held liable under the rule of the last clear chance, because his appliances are not sufficient to meet such an emergency? We think not.

Thompson, in volume 1, section 232, in his Commentaries on Negligence, in speaking of the doctrine of the last clear chance says: "The doctrine of this textt can have no just application in any case, except when the person inflicting the injury was under the duty of *exercising care to discover the exposed situation of the person receiving the injury.*"

Is it the duty of the master to maintain a constant watch to ascertain whether any one of his servants is about to violate or has violated one of the master's rules of safety? Must the master so conduct his business as to be able at all times to protect the servant against all dangers that he may be threatened with by reason of an emergency which was created by the servant's conduct in violating one of the master's rules? If such be the law, then there is no distinction between the duty a master owes to a servant who obeys the rules, and is injured in the ordinary course of the master's business, and one who is injured by an accident which was brought about by the violation of one of the master's rules of safety by the injured servant. No doubt the master must exercise due care to prevent injury to the offending servant after his perilous situation is discovered, but surely the master cannot be held negligent because he is not prepared to obviate every injury that may result from extraordinary emergencies, brought about by the violation of the master's rules. Counsel have found no case which is directly in point, and, after a most thorough and careful search, we have not been able to find any. The case of *Neet v. Burlington, C. R. & N. Ry.,* 106 Iowa 248, 76 N. W. 677, is nearer in point than any other that could be found by a careful examination of the cases referred to in the notes found in 55 L. R. A., pages 418 to 456, and in 18 Am. Neg. Rep., pages 161 to 173, in which notes the cases bearing upon the doctrine of the last clear

chance are collated. The Iowa case is nearest in point, because in that case the injured boy was a wrongdoer in going onto a freight train of the railroad company. The recovery in that case was, however, squarely based upon two points: (1) That the engineer refused to stop the train after being plainly signaled to do so, which was held negligence for which the company was liable, and (2) because the jury were authorized to find that the injury of the boy was caused because of the negligence of the engineer. If the appellant in this case could complain of the acts of the engineer, he too, might have appealed to the jury on that ground with some confidence at least. What we have said also applies to the other instruction of which complaint is made.

We are thoroughly convinced that in view of the whole record no prejudicial error is made to appear, and that the verdict of the jury is not only right, but that the jury could not, without doing violence to their consciences, have found for the appellant.

The judgment is therefore affirmed, with costs to respondent.

McCARTY, J., concurs.

STRAUP, J.

I concur in the result. I do not concur in the conclusion reached that there is no sufficient evidence to support the allegations of negligence in respect of the braking appliances, nor in the remarks relating to respondent's duty under the given circumstances.

At the outset let it be understood that no claim is made that a duty was imposed upon the respondent to have its engine and cars so equipped and conditioned as that an unusual or extraordinary emergency stop could have been made, or the consequences of the negligence of another, or unanticipated or extraordinary happenings avoided, or that the respondent could "be held culpably negligent" with respect to a discharge of duties in furnishing and providing,

if the appliances furnished and provided by it were "suffi-
cient to meet all of the ordinary requirements of the busi-
ness and to protect its servants in the discharge of their
duties," whilst themselves exercising ordinary care. The
case was not submitted to the jury on any such doctrines.
The claim asserted on the one hand and denied on the other
is that the braking appliances were so defective and ineffi-
cient as that a usual and ordinary emergency stop could
not be made, by reason of which the consequences of a known
and discovered perilous situation could not be, and were not,
avoided, but which could have been avoided, had the braking
appliances been in a reasonably safe and suitable condition
and repair. And, in accordance with such asserted and de-
nied claim, the court charged the jury that it was alleged by
appellant, and denied by the respondent, "that the braking
apparatus in question was defective or out of repair to such
an extent that the train would run so far after an effort was
made to apply the brakes that the employees working about
the train were exposed to unusual and unnecessary danger,"
and that "it was the duty of the defendant to exercise ordi-
nary care to keep the braking apparatus in such a condition
and state of repair" as that the train, in case of necessity,
could be promtply stopped, and the employees working about
the same not "exposed to unusual or unnecessary danger."
No complaint on this appeal is made of the submission of
such questions to the jury.

The questions presented on the appeal relate to the charge
of the court on the question of contributory negligence. It
is not claimed by respondent that there was no sufficient
evidence to sustain the allegations of negligence relating to
the defective braking appliances. What is claimed by its
counsel, as well as by counsel for appellant, is that the evi-
dence on that question is conflicting. Counsel for respondent
in their brief admit that there is evidence tending to prove
that the braking apparatus on the engine and train was de-
fective and out of repair, that its condition was due to re-
spondent's negligence, that an effort was made to stop the
train, and that the effort was unsuccessful because of the bad

condition of the braking apparatus. They, however, also say "there was an abundance of proof to the contrary, which the jury believed and so found the facts to be." They also say: "So, too, we may frankly admit that in view of the conflicting evidence on these points the jury might have found in favor of the plaintiff, but a sufficient reply to this is that the jury, upon the conflicting evidence, found for the defendant." My Brethren, however, have reached the conclusion that the charge relating to contributory negligence, and of which complaint is made, if erroneous, was not prejudicial because of the insufficiency of the evidence to show negligence on the part of the respondent in respect of the braking appliances.

Passing the question of propriety in reviewing such a question of insufficiency of the evidence without complaint, or assignment, or specification of particulars, and against the admissions of counsel of both parties that the evidence was sufficient in such particulars, I refer to the evidence, though conflicting, yet which I think supports the allegations of the complaint in that regard. In doing so, I shall also, in that connection, refer to other facts in support of the views entertained by me on the question presented on this appeal.

The conductor, in charge of the crew operating the engine and cars in question, on behalf of plaintiff, testified that a few days before the accident he reported the condition of the engine to the chief dispatcher of the defendant, the person to whom such a report should have been made. He testified: "Complaint had been made to me by the engineer and the rest of the crew. I reported it from Thayer Junction once or twice. I know that the report was that the engine was not safe to work with; that it was dangerous to the crew. The engineer asked me to turn the engine in. They (the crew) complained to me that the engine was not safe to work with."

Hamilton, the head brakeman, testified on behalf of plaintiff as follows: "Prior to the accident, I knew the difficulty with the driver brakes" of the engine. "They had been cut

out a majority of the time. They would not work. The
air was cut out of coach 776 (the combination coach) at the
time of the accident. It had been cut out all the time I was
on that run. If you would set the driver brakes on the
engine, they would seem to be severe, and you would have to
stand and wait for them to release; it would take a long time
for them to release. When the brakes are cut out, you cannot
use them. The brake rigging on the tender was loose. It
would not hold on the hill. I had noticed that It would
not hold on the tender all the time I had been on the run,
whenever we had the engine, up to the day of the accident.
I knew nothing of the triple valve being out of order of my
own knowledge. I knew about the engine having trouble
with the air pump before the accident. It would stop and
not supply the train. Would not pump enough air. I had
noticed that four or five times. I knew about the engine
being reported bad on that subject. The conductor turned
her in up there while I was on the run. I saw the message
he wrote a day or two before the accident. By turning the
engine in I mean that the engine was not in a fit condition
to work with. After the message was sent, the engine was
not repaired; it was not taken off the run at all.  . . .
The brakes on the tank would slide; they would not hold
good; they were so all the time I was up there."

The plaintiff also put in evidence written reports made
by the engineer to the defendant relating to the engine, one
on the 29th day of August, which read: "Engine 1674.
Pack air pump all around; fix tank brakes. Fix triple valve
on engine so brakes will release. Fix front drawbar, no nuts
on bolts. Tighten right valve head." Another on August
30th: "Fix right by-pass valve so won't leak. Put triple
valve on engine 1674. Fix tank brakes." Another on Au-
gust 31st: "Engine blows bad around both left cylinder
heads. Left back valve head blows. Put triple valve in
engine. Fix tank brakes. Tighten both steam head and air
pump."

The engineer, a witness for the defendant, testified that
the "braking apparatus of the engine and tender up to the

time of the accident was good, with the exception of one thing; the triple valve wouldn't let the brakes release." When his attention was called to the written reports made by him, and just referred to, he did not deny making them, nor did he say that any statement made in them was untrue.

The fireman, also a witness for the defendant, testified that the "braking power was all right, except that the driver brakes wouldn't release; there was too much slack in the tender brakes. They did not set up close enough to the wheel, and let the piston a little too long to give the proper power they would have had if shortened up." He admitted that after the accident he told appellant's brother that at the time of the accident "there was a small iron that holds the top end of the dead liner that was broken, so it left more slack than there ought to have been in the brakes," and testified that such statement so made by him was true. It was also shown that immediately after the accident, and also a short time thereafter, the engineer operating the engine stated to the conductor, to the head brakeman, and to appellant's brother, that he (the engineer) saw Hamilton's, the head brakeman's, first stop signal, and said: "I gave her the works; she wouldn't stop; I did all that I could to stop her," meaning the engine, and that "I gave her all I had," meaning he gave the engine all the air that he had. It was also shown that another witness, a member of the crew, and who also testified for the defendant that "there was nothing that would indicate any defective condition of the braking power," had stated, after the accident, that "the tank brakes were not very good and wouldn't hold." Considering the extrajudicial statements of the witnesses as merely affecting credibility of the witnesses and weight to be given their testimony ,and not considering them, except those made as a part of the *res gestae,* as in themselves showing that the engine or braking appliances were defective, still there is sufficient other evidence to support the allegations of the complaint relating to the defective appliances. Two other witnesses, the defendant's assistant superintendent and trainmaster, also testified on its behalf that the braking appli-

ances on the engine and cars were in good condition and were efficient. They, however, testified that various complaints and reports had been made with respect to the condition of the engine and braking appliances.

After the train had reached Thayer Junction some switching was there done. The appellant was the rear brakeman. It was testified to, both by witnesses for the plaintiff and the defendant, that in switching it was a common occurrence for most brakemen to get on and off the pilot. Of course, it was in violation of the respondent's rules. The appellant, after adjusting a switch and giving the engineer a signal to start and to proceed toward another switch where Hamilton, the head brakeman, was, got on the pilot of the engine. After the train had started and had moved about ten feet, as testified to by him, he fell off and underneath the pilot, and was rendered unconscious. Hamilton who was but a short distance away, saw the appellant fall. On this subject he testified: "I was looking when he fell. He fell underneath the pilot, turned over twice; then I lost sight of him. I signaled to stop, and ran toward the engine. I gave the stop signal with my hands as hard as I could. That means to stop immediately. The signal I gave meant to stop at once. At the time I gave that signal, don't think they had traveled over twenty feet past the switch. When I gave the stop signal, I noticed no difference in the speed of the engine. I ran toward it, while giving the stop signal. Couldn't say how many times I gave it. I ran three to five car lengths toward the car."

When the witness got to the engine and the train had stopped, the engineer then said to him: "What is the matter? Is the brake beam down?" The witness told him: "No! Fred (the appellant) is underneath. Don't move her." The engineer then said he "saw me when I gave the first stop signal, and gave it all to her." True, this testimony is, in some particulars, disputed by the testimony of the engineer, which has already been referred to by the Chief Justice. From the place where the appellant fell to the place where the engine was stopped was a distance of from eighty to one

hundred feet. The appellant was pushed or dragged that distance, as testified to by one witness, and "something like a car length," as testified to by another. After the train was stopped, the appellant was found "lying on his back with his head to the west;" the train having been moved toward the east. "His left arm was up in the point of the switch, the one on the left side, the upper point—laying right in the point of the switch. It was in there tight—so tight that I couldn't get him out myself. It was shoved right in—the point of the rail right up under the arm pit. The train had run on the arm, lengthwise of the arm." At this point blood was also found. None was found at any other place. Evidence was also adduced by appellant tending to show that a train of cars, such as in question, and upon a track substantially level, as the track here was starting from a stop and traveling about twenty feet, would not acquire a speed of more than four miles an hour, and if properly equipped with air brakes could, upon an emergency, be stopped almost immediately within three or four feet; if the combined weight of the engine, tender, water car, combination coach, water tank filled with water, and the coal bin filled with coal was two hundred and thirty tons, and the train going five to six miles an hour, it could be stopped within ten or twelve feet.

Now, upon the issues and upon the evidence, the contentions made by the respondent were that the braking appliances were not defective; that the appellant was guilty of contributory negligence; and that if his injury was the result of negligence other than that of himself it was the negligence of the engineer in failing to respond to the stop signals of the head brakeman. The court charged the jury that under the law of Wyoming the engineer and the appellant were fellow servants, and that the respondent was not responsible for an injury inflicted upon the appellant through the negligence of the engineer. On the other hand, it is and was contended by appellant that the braking appliances were defective, and that there is sufficient evidence to justify a finding to that effect; and though the plaintiff was guilty

of negligence in going upon or falling from the pilot, still there is sufficient evidence to show that immediately after he fell the head brakeman gave to the engineer a stop signal which was seen by the engineer, who immediately attempted to stop the train, but was, on account of the defective appliances, unable to do so until the train had traveled a distance of eighty to one hundred feet; and that the serious injury to the appellant—the mangling of his arm, requiring its amputation—was caused at the place where his arm was wedged in between the rails by the wheels of the engine or cars there running over it, or by being wedged between the rails. I think there is sufficient evidence to support such a theory of the appellant, and, had such facts been found in his favor, I think he would have been entitled to recover. (*Thompson v. Rapid Transit Co.*, 16 Utah 281, 52 Pac. 92, 40 L. R. A. 172, 67 Am. St. Rep. 621; *Teakle v. S. P. L. A. S. L. R. Co.*, 32 Utah 276, 90 Pac. 402, 10 L. R. A. (N. S.) 486.)

But the contention made by appellant on this appeal, and controverted by the respondent, is that the court by its charge precluded appellant from going to the jury upon such a theory. That, as I view it, is the real question presented for decision. I think a proper disposition of it involves the application of the rule of proximate and remote causes. The particular instruction complained of is set forth in the opinion of Chief Justice. Of course, that instruction must be read in connection with the whole charge bearing on the question. The court also charged the jury that "contributory negligence is defined to be where a person injured has proximately contributed to the injury by his want of ordinary care, so that, but for such want of ordinary care on his part, the injury would not have been done. By proximate cause is meant that cause which, in a natural and continuous sequence, unbroken by any new cause, produced the injury, and without which the injury would not have occurred." The court further charged the jury "that it was the duty of the defendant company to exercise ordinary care to keep the braking apparatus in question in such a condition and

state of repair that the train could be stopped so promptly that the employees working about the same might not be exposed to unusual or unnecessary danger," and if the jury found that the braking appliances were defective, or out of repair, and that such condition was due to respondent's negligence, then "you should next inquire whether such condition of the braking appliances was the proximate cause of the injury to plaintiff." The court also charged the jury that it was the duty of the appellant, at the time and place of the accident, to exercise reasonable and ordinary care to prevent accident or injury to himself, and that if he failed to do so, and such failure "directly or proximately contributed to the accident and injury sustained, he would not be entitled to recover in this action;" that it was negligence for an employee to make a use of his employer's appliances that were not intended or designed for the use which the employee made of them; and that "if you find from the evidence in this case that the plaintiff, at the time and place of the accident, in stepping upon and using the pilot and its appliances as a place to ride upon, so made a use thereof that they were not intended or designed for, and such use was of a nature that a reasonable man of ordinary experience would know, or have reasonable ground to apprehend, was dangerous, and that such use approximately contributed to the accident, then your verdict must be for the defendant."

When the charge is considered as a whole, I am of the opinion that the appellant was not precluded from going to the jury on the theory contended for by him. Under the charge the jury were permitted to find that the negligence of the appellant in going up on or falling from the pilot was fully spent and did not proximately nor directly contribute to the injury of his arm, and hence was the remote cause; and that the respondent's negligence relating to the defective appliances was the proximate cause of such injury. When I say there is sufficient evidence to justify a finding that the injury to the arm was not inflicted until the train had moved eighty or one hundred feet, it should not be understood that the jury were required to so find. Upon that

point the evidence is not by any means conclusive or one-sided. There is evidence in the case from which the jury were justified in also finding that the injury to the arm was inflicted while the plaintiff was pushed and dragged, or was under the train, and before it could have been stopped, had the appliances been in a reasonably safe and suitable condition. So, too, there is evidence to justify a finding that the appliances were not defective, and that the train was not stopped solely because of the engineer's failure to heed the stop signals of the head brakeman.

As already stated, upon these questions the evidence is in conflict. But upon the evidence, and under the charge, the appellant, in support of his theory, was at liberty to go before the jury and to urge that the braking appliances of the engine and cars were defective; that the negligence of the appellant in going on the pilot or falling from it had ceased when he fell under it; that his arm was not injured until he had been dragged and pushed a distance of one hundred feet; that the engineer saw the first stop signal of the head brakeman and responded to it by attempting to make an emergency stop; that he was unable to do so, because of the condition of the braking appliances, until the train had moved a distance of eighty feet or more; that the engineer could have stopped the train within a distance of five or ten feet and the injury to appellant's arm prevented, had the appliances been in good condition; and hence the negligence of the appellant was the remote, and that of the respondent the proximate, cause of the injury to appellant's arm. And had the jury so found the facts, I do not see wherein they were precluded or misled by the charge from rendering a verdict in appellant's favor.

When the particular instruction complained of is considered by itself, there is much force to the contention that it is misleading or indefinite, and that the jury, by considering it alone, may have been led to believe that they were required to find against appellant if he was at fault in going on or falling from the pilot, regardless of the other assumed facts in the instruction upon which the jury were told the

respondent was liable. When, however, the charge is read in connection with other portions of the charge that appellant's negligence, to defeat a recovery, must be found by the jury to have been the proximate cause of the injury, defined to be "that cause, which in a natural and continuous sequence, unbroken by any new cause, produced the injury, and without which the injury would not have occurred," and the court leaving to the jury, as it did, the determination of the question, upon all the evidence adduced, of whether appellant's or respondent's negligence, if they found it was negligent, was the proximate cause of the injury, I do not think the charge open to such objection.

I dissent from the remarks indicative of a holding that respondent owed appellant no duty in the premises to use care, because appellant got on the pilot in disregard of respondent's rules forbidding such act. That act, it may be conceded, rendered him guilty of negligence. But a servant who is guilty of negligence in the commission or omission of a particular act or thing in the prosecution of his work is not in law to be characterized a mere trespasser, to whom the master owes no duty, except to refrain from inflicting upon him a willful or a wanton injury. The negligence of a servant defeats a recovery in an action against his master, not on the theory that the duties of the latter cease or are suspended when the negligence of the former is shown, but on the well-established principle that the negligence of the servant contributed to or was the proximate cause of the injury. If his negligence was not a contributing nor the proximate cause, he may still recover by showing that the master's negligence was the proximate cause; and he may even recover, though his negligence was a contributing cause, if the master's acts in inflicting the injury were wanton or willful, for contributory negligence is no defense against an injury inflicted by wantonness or willfulness. The fact that appellant was guilty of negligence in getting on the pilot did not relieve nor discharge the respondent of its duties, which were not to furnish equipments to avoid consequences of negligence of another, or unusual or extraordinary happenings or

occurrences, but to furnish equipments reasonably safe and suitable to enable ordinary and usual emergency stops to be made upon occasions requiring them to be made. Respondent's duty in that regard did not cease, nor was it suspended, simply because the appellant was negligent. And, as heretofore shown, I think there is some direct and positive evidence tending to show that the braking appliances were not reasonably safe and suitable, that appellant's perilous situation was discovered as he was falling from the pilot, that a violent stop signal was immediately given the engineer, that the signal was seen by him, that he at once gave the engine "all the works"—gave it all he had—and tried to stop, and though the train was running at a speed of but four or five miles an hour on a level track, yet, on account of the defective braking appliances, he was unable to stop it until it had gone a distance of eighty feet or more, and that had it been equipped with reasonably safe and suitable appliances the train, under all the circumstances, could have been stopped within ten or twelve feet, and the serious injury to appellant's arm prevented. Surely, upon such evidence, a finding of negligence with respect to the condition of respondent's braking appliances, and as admitted by counsel for respondent, would have ample support.

It is not for me to say whether the testimony of the witnesses tending to show these facts was true or not, or whether it was overcome or outweighed by other more certain and reliable testimony. The court having charged that the appellant was guilty of negligence in going upon the pilot in disregard of respondent's rules, and there being evidence to show that the respondent was also guilty of negligence, the question then was whether the negligence of the appellant was a remote or the proximate, or a contributing, cause of his injury, or whether the negligence of the respondent was the direct and proximate cause. That question the court left to the jury. They found in favor of the respondent. Whether the jury, upon the conflicting evidence, reached this conclusion upon a finding that the braking appliances were not defective, or that the engineer was negligent in not

promptly responding to the stop signals of the head brake-man, or that appellant's negligence was the proximate or a contributing cause of his injury, of course, cannot be ascertained from the general verdict. Upon the evidence the jury could have found these questions either way. And being of the opinion that these questions were properly submitted to the jury, and that the charge of the court did not preclude appellant from going before the jury on the theory contended for by him, I think the finding of the jury is conclusive, and that the judgment of the court below ought to be affirmed.