## WHALEN v. UNION PACIFIC COAL CO.

No. 2984. Decided October 4, 1917. (168 Pac. 99.)

1. MASTER AND SERVANT—RELATION OF PARTIES—TREMINATION. Where a coal mining company, which maintained in its mine an electric railway for hauling coal, carried its men from their working place to the surface, by such railway and a connecting cable railway, the relation of master and servant continued until the employees were taken to the surface and departed from the cars, and were no longer under the control of the company or amenable to its rules and regulations.[1] (Page 461.)

2. MASTER AND SERVANT—LIABILITY FOR INJURIES—ELECTRICAL APPLIANCES. A coal mining company, which maintained an electric railway on which its men were transported from their working places to the main slope leading to the surface, was not negligent in maintaining the trolley wire about five feet and seven inches above the track, and only fourteen inches horizontally outside of and away from the tracks where it appeared that to increase the height of the tunnel by breaking the roof as it existed at the time the coal was mined and

---

[1] *Jachetta* v. *San Pedro, L. A. & S. L. R. Co.*, 36 Utah, 482, 105 Pac. 100, 52 L. R. A. (N.S.) 1106; *Grow* v. *O. S. L. R. Co.*, 44 Utah, 160, 138 Pac. 398, Ann. Cas. 1915 B, 481.

removed therefrom would create a greater danger by reason of the material overhead falling. (Page 462.)

3. MASTER AND SERVANT—LIABILITY FOR INJURIES—ELECTRICAL APPLIANCES. The company was not negligent in failing to house and guard the trolley wire, where it appeared that any metal guard would become as dangerous as the wire itself, while, if it were made of wood, slight falls of top coal or roof rock would break it and leave spines hanging down, thereby increasing rather than diminishing the danger incident to the use of the road. (Page 463.)

4. MASTER AND SERVANT—LIABILITY FOR INJURIES—DEGREE OF CARE REQUIRED. A master is not required to use more than ordinary care and diligence to provide his servant reasonably safe ways of ingress and egress to and from the place of work. (Page 464.)

5. MASTER AND SERVANT—LIABILITY FOR INJURIES—CUSTOMARY APPLIANCES. In providing instrumentalities, appliances, and safeguards, a master's duty is performed by providing those that are in common use by others engaged in the same business, and that are reasonably safe and suitable for the purposes for which they are intended and the use to which they are applied.[1] (Page 464.)

6. MASTER AND SERVANT—ASSUMPTION OF RISK—ELECTRICAL APPLIANCES. Where a mine employee was, and for a considerable period had been, familiar with the location of trolley wire with reference to car tracks and cars on which the men were transported from their working place to the main slope of the mine, and fully understood and appreciated the dangerous character of the trolley wire when carrying a heavy current of electricity, and the probable fatal result to a person coming in contact with it, he assumed the risk and hazards, all of which were obvious and presumably known to him. (Page 469.)

7. MASTER AND SERVANT—LIABILITY FOR INJURIES—WARNING—FAILURE TO COMPEL OBEDIENCE. Where a mining company, which transported its men from their working place to the main slope of the mine on an electric railway through a low tunnel, had a man at the place where the men boarded the cars to warn them to stand back until the electric current was turned off, it was not necessary, to relieve it from liability for death caused by contact with the trolley wire, that it should use physical force to prevent the men from prematurely boarding the cars, because of their desire to ride in the cars nearest the motor so as to be in a better position to be taken up the main slope on the first trip. (Page 469.)

8. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE—TAKING DANGEROUS POSITION. An employee of a mining company who boarded

---

[1]*Fritz* v. *Elec. Light Co.*, 18 Utah, 500, 56 Pac. 90; *Roth* v. *Eccles*, 28 Utah, 456, 79 Pac. 1918.

a car, used in taking the men from their working place to the main slope of the mine, by attempting to step on the bumper and climb over the end instead of the side of the car, thereby coming in contact with the trolley wire, was negligent, where it was recognized by the employees, and presumably known to the one in question, that it was extremely dangerous and hazardous to board the car in this way, and he did it merely to avoid the probable inconvenience of waiting ten or fifteen minutes for the second trip up the main slope.[1] Page 470.)

9. MASTER AND SERVANT—ACTION FOR INJURIES—DEGREE OF CARE— ''ORDINARY CARE.'' A master who maintained electric wires carrying a high or dangerous quantity of electrical energy was not bound to exercise the ''greatest care and prudence to prevent injury to his employees''; a master's duty to his employees being performed by using ordinary care for their safety, and ''ordinary care'' is that degree of care which ordinarily prudent and careful persons would ordinarily exercise under the same or similar circumstances, though when the danger is greater, the degree of care required to constitute ordinary care is greater.  (Page 470.)

Appeal from District Court, Second District; *Hon. N. J. Harris*, Judge.

Action by Thomas A. Whalen, administrator, against the Union Pacific Coal Company.

Judgment for plaintiff.  Defendant appeals.

REVERSED with directions.

*Geo. H. Smith, J. V. Lyle, B. S. Crow* and *C. R. Hollingsworth* for appellant.

*John G. Willis, S. T. Corn* and *Geo. Halverson* for respondent.

STATEMENT OF FACTS

This is an action by Thomas A. Whalen, as administrator of the estate of Pero Vucovich, against the Union Pacific Coal Company, a Wyoming corporation, hereinafter referred to as company, to recover damages for the death of Vucovich alleged to have been caused by the negligence of the company. A trial was had to a jury in the district court of Weber County,

[1] *Fritz* v. *Elec. Light Co.*, 18 Utah, 500, 56 Pac. 90; *Roth* v. *Eccles*, 28 Utah, 456, 79 Pac. 1918.

which resulted in a verdict in favor of plaintiff in the sum of $2,357.14. To reverse the judgment rendered on the verdict the company prosecutes this appeal.

The facts, briefly stated, are about as follows:

On October 17, 1913, Pero Vucovich was, and for about three years had been, in the employ of the company as a laborer in one of its mines, referred to in the evidence as mine No. 10. This mine consisted of a system of tunnels and subterranean rooms. The company maintained an electric lighting system to illuminate the interior portion of the mine, and to supply electrical power to haul and transport coal from the interior of the mine to the surface. The mine is entered through a tunnel referred to in the evidence as the "main slope." This tunnel has a somewhat steep descent from its portal into the interior of the mine. On its course it is intersected by various tunnels, referred to by the witnesses as "entries." One of these, known as No. 5 or main entry, is nearly level, and is equipped with an electric railway and coal cars. These cars are propelled or drawn by an electric motor with trolley pole attached thereto, and connected with an overhead trolley wire, which is suspended from the roof of the tunnel by uninsulated hangers fastened with screws or blocks of wood in the roof of the tunnel. The equipment is somewhat similar to that of an electric street railway system. The trolley wire was close to the wall and ceiling on the lower side of the entry, and as far away from the men and the cars as it could be placed. It was uninsulated and unguarded, except that at manways or landings, where men are continuously passing to and fro under it, there is a wooden boxing or guard for a distance of ten or twelve feet. The main, or No. 5, entry is a little more than two miles long, and approximately ten feet wide and from six to seven feet high. The height varies with the height or thickness of the vein of coal through which the tunnel passes. This entry is intersected at various points at approximately right angles by other tunnels known as "stopes." These stopes have a gradual pitch or incline, so that, on traveling along No. 5 entry, the intersecting stopes ascend on the one side and descend on the other.

The stopes are numbered 1, 2, 3, 4, 5, etc. Coal is mined in the various rooms and chambers connecting with the various stopes that intersect the main, or No. 5, entry, and is transported in cars running on tracks along the stopes to the main, or No. 5, entry. When the cars loaded with coal, ascending or descending the slopes, as the case may be, reach the main entry they are coupled to an electric motor and taken along the almost level track in the entry to the main slope, where they are uncoupled from the motor and fastened to a cable, and by means of a hoist are hauled to the surface, where the coal is unloaded into a tipple and screened.

At the point where the accident in question occurred, and for a considerable distance along the entry in either direction, there is a double track. The floor and roof of the entry slope laterally to a certain extent, because of the tip or incline of the seam of coal through which the entry extends. Where the track is double there is a "high side track" on one side and a "low side track" on the other side of the tunnel or entry. The high track is used as the passageway for the empty cars, and the lower track on the other side of the tunnel or entry is used for the transportation of the loaded cars. The cars are seven feet long, three feet six inches wide on top, and three feet three inches high above the rails of the track. The distance from the top of the rails to the trolley wire is four feet eight inches. At or near the intersection of No. 5 slope with the main entry, a small tunnel leads off from and parallels the entry in the direction of the main entrance to the mine, and returns to and intersects the main entry a few hundred feet from slope No. 5. This tunnel is referred to in the evidence as "run round." When the motor returning from the main slope with a train of empty cars pulls onto the upper track near slope No. 5, it frequently happens that both tracks are blocked, the upper track with the empty cars attached to the motor and the lower track with loaded cars. On such occurrences the motor is detached from the empty cars, taken through the "run round" and brought upon the main tracks of the entry at the end of the train of cars nearest the mouth of the tunnel, and then is attached to the loaded cars and

draws them to the foot of the main slope. The "run round" is a species of switch used for the purpose of transporting the motor from one end of a train of coal cars to the other. The accident in question occurred on the main track, about midway between the points where the terminals of the "run round" intersect the main tracks. Since the installation of the electric railway system in the mine, it has been the custom for the men employed in the interior of the mine, on quitting work at the end of a shift, to assemble at a place selected by the company and wait until the empty cars come in for them, and then board such empty cars and ride to the foot of the main slope, at which point they are transferred to another train of empty cars and hauled to the surface by means of a hoist. The trip on which the men are taken from the interior of the mine to the surface is called the "man trip." At the time of the accident, and prior thereto, there was a manway, free from the dangers incident to trolley wires and moving coal cars, leading from the interior to the surface of the mine, in which the men could walk if they so desired. Eighty-two feet outward from where the accident occurred there is an automatic switch connected with the trolley wire. The switch can be operated by means of a stick of wood or it will operate automatically when the trolley wheel passes over it.

It was customary for the motorman in charge of the man trip, after he brought the cars in from the foot of the main slope and placed them in position for the men to board them, to transfer the motor to the rear end of the train of empty cars by taking it through the "run round," and, if the men remained in the place where they had assembled to wait for the man trip, to walk down to the switch and disconnect the current from the wire extending toward and over the train of empty cars. The men were supposed to remain at the place where they had assembled until this man trip was made up and the signal given by the motorman for them to board the cars, after he had shut off the current from the wire extending to and over the empty cars. The men quite frequently, in fact they generally, boarded the cars before the motorman gave the signal. The reason for this was that when the man

trip reached the foot of the main slope it ordinarily required two trips up the slope to convey all the men to the surface. Therefore those who were in the front cars of the man trip would have a better opportunity, on arriving at the foot of the main slope, to get into the cars there and be hauled to the surface on the first trip than the men who were in the rear of the man trip cars.

McCARTY, J. (after stating the facts as above).

The alleged negligence pleaded in the complaint is: (1) That the company maintained unguarded and uninsulated the trolley wire mentioned in the foregoing statement of facts "at a distance of only about five feet and seven inches perpendicularly above, and only about fourteen inches horizontally outside of and away from, said tracks"; (2) that it "failed to maintain a watchman to warn said employees when the current was on the wire, and inform them when it was safe to board the man trip"; (3) that it failed and neglected to turn off the current of electricity from the trolley wire before permitting its employees to board the man trip; (4) that it failed to establish and enforce rules forbidding its employees to board the man trip before the current was turned off. The company denied that it was negligent in any of the particulars alleged in the complaint, and pleaded assumption of risk and negligence on the part of the deceased.

Counsel for respondent contend that when the deceased, Vucovich, quit work on the afternoon of, and just before, the accident in question occurred, the relation of master and servant ceased to exist, for the time being, between him and the company, and that, when he boarded the man trip, and at the time he was killed, the relation between him and the company was that of carrier and passenger, and that therefore the assumption of risk rule has no application in this case. We do not agree with counsel. The relation of master and servant continued to exist until the employees boarding the man trip were taken to the surface of the mine, departed from the cars, and were no longer under the control of the company or amenable to its rules and regulations.

*Jachetta* v. *San Pedro, L. A. & S. L. R. Co.*, 36 Utah, at page 482, 105 Pac. 100, 52 L. R. A. (N. S.) 1106, *Grow* v. *O. S. L. R. Co.*, 44 Utah, 160, 138 Pac. 398, Ann. Cas. 1915B, 481, and cases cited.

When plaintiff's evidence was in and he had rested his case in chief, the company moved the court for a nonsuit. The grounds upon which the motion was based were: (a) That there was no evidence tending to show that the company was negligent, or that the death of Pero Vucovich was caused by the negligence of the company or any of its employees; (b) that the evidence affirmatively shows that the condition of the trolley wire was known to the deceased, and that the risks incident to, and the dangers resulting from, the maintenance of the wire were open and obvious and were appreciated by him, and that he assumed the risk, etc. When the evidence was all in and both sides had rested, the company requested the court to instruct the jury to return a verdict in its favor. The overruling of the motion and the refusal of the court to give the requested instruction are assigned as error.

The evidence shows that the height of the entry or tunnel in which the accident occurred varies with the height or thickness of the seam of coal through which the entry extends, and that there are but few, if any, places where the distance between the floor and the roof is less than six feet. The undisputed evidence also tends to show that it would be impracticable to increase the height of the entry by breaking the roof as it existed at the time the coal was mined and removed thereform, as it would create an additional element of danger.

W. J. Hallett, a mining engineer, who was, at the time of the trial, and for nearly ten years prior thereto had been, in the employ of the company and was familiar with the workings and conditions of the mine at the time of the accident, testified—and his evidence on this point is not disputed—that in mining coal it is impracticable to break the roof of the seam "any more than is absolutely necessary"; that when the roof is broken the material overhead is hard to hold up and "continually falls and makes a dangerous condition," and that it

is better "to put up with a little less height in a narrow seam than to break the roof and introduce that element of danger."

The alleged negligence, however, mainly relied on by plaintiff, respecting the unsafe condition of the entry where the accident occurred, was the failure of the company to adjust and guard the trolley wire so as to prevent the men from coming in contact with it when they boarded the man trip. Counsel for plaintiff contend with much earnestness that the company's failure in that regard is sufficient to support a finding by the jury that the company was negligent. We think counsel's position is untenable, because the evidence, without conflict, tends to show that the dangers and risks of the employment would be increased rather than diminished by housing and guarding the trolley wire. Mr. Hallett, the mining engineer referred to, testified—and his evidence is not disputed—that:

"It would be more dangerous to fence the trolley wires than it would be to leave them as they are. Any fence would have to be of wood—if it was metal it would be shorted on account of the moisture in the mine, and would become as dangerous as the wire itself, * * * and if it were made of wood slight falls of top coal or roof rock would break it and leave spines hanging down, which, when running the loaded trips out, the motorman would be running into. Also it would make it more or less dangerous on the same point for the man trips because those falls occur all the time."

George Blackel, a practical coal miner of many years' experience, and who was, at the time of the accident, state coal mine inspector of the district in which the mine in question is located, testified, in part, as follows:

"I inspected that mine in August, 1913, and then I inspected it about three months afterwards. I am familiar with the mine entry clear back to slope No. 5. * * * In my judgment the methods and appliances and machinery, and in particular the manner in which the trolley wire is left unguarded, and this distance between the floor and the roof, and the distance of the trolley wire from the floor and its

position to the cars, is favorable with the other mines, and in many of them excels them."

He further testified:

"I have been inspector since 1911. * * * I am familiar now, and was in the month of August and at the time I made the inspection, * * * with the condition of other mines in my district in Wyoming. * * * I inspect these mines once every three months. * * * In none of the other mines in my district are there electric wires, which are used for trolley wires in the mines, guarded in any manner. In my judgment, as a mining man, it is not practicable to place any guards around these trolley wires, except at the manways where the men pass to and fro under them."

Andrew Bone, a practical miner of much experience, who was in the employ of the company, and who was at the place of the accident when it occurred, testified, in part, that:

"The size of the wires, their position and condition, so far as their being insulated or uninsulated are concerned, compare favorably with the general usage in the other mines I have worked in. I never saw any better conditions in a mine than what were in No. 10 Rock Springs"—the mine in question.

Other witnesses testified, substantially, to the same thing. As we have pointed out this evidence is not disputed in any particular.

The rule is elementary that the master is not required to use more than ordinary care and diligence to provide his servant reasonably safe ways of ingress and egress to and from the place of work.

In providing instrumentalities, appliances, and safeguards, the master's duty in that regard is performed by providing those that are in common use by others engaged in the same business, and that are reasonably safe and are suitable for the purposes for which they are intended and the use to which they are applied. 1 Shearman & Redfield, Neg. sections 194, 195; 26 Cyc. 1108; *Fritz* v. *Elec. Light Co.*, 18 Utah, 500, 56 Pac. 90; *Roth* v. *Eccles*, 28 Utah, 456, 79 Pac. 918.

The evidence is all but conclusive that the company in the case at bar discharged every duty imposed on it by law to use ordinary care and diligence to furnish and equip the entry, prior to and at the time of the happening of the accident, with proper and suitable appliances and safeguards. Furthermore, the undisputed evidence tends to show that if the company had done what counsel for plaintiff contend it should have done, placed guards about the trolley wire, it would have increased rather than have diminished the dangers incident to the maintenance of the wire.

The contention that the company failed to establish and enforce rules forbidding its employees to board the man trips before the current was turned off the trolley wire, and hence was guilty of negligence, is unavailing. As pointed out in the foregoing statement of facts, when the man trip loaded with men arrived at the main slope it usually required two trips from that point to take the men to the surface. Owing to the desire of the men to be taken out of the mine on the first trip up the slope, there was more or less of a scramble among them when they assembled to board the man trip to get into the front cars or those nearest the motor, as those who succeeded in doing this would have a better opportunity, on arriving at the main slope, to board the first cars leaving the bottom of the slope for the surface than those who were in the rear cars of the man trip. The evidence of the witnesses for both plaintiff and defendant—evidence that is not in conflict in any particular—shows that the company, prior to and at the time of the accident, had a man, known as the "Safety First" man, stationed in the main entry near where the men in No. 5 slope assembled for the purpose of boarding the man trip; that a part of his duties was to keep the men at the place where they had assembled until the man trip was made up and a signal given by the motorman in charge of the train for the men to board the cars; that on many occasions prior to the accident the "Safety First" man was unable to control the men; that they persisted, notwithstanding the protests made by him, in leaving the place where they were assembled and in rushing to the man trip and boarding it as soon as it

arrived, and while the motor was being transferred from one end of the string of empty cars to the other; that this state or condition of affairs existed at the time of the accident. Red Morris, a witness for plaintiff, testified that he, on the day of the accident, and for ''a couple or three months'' prior thereto, had been working in slope No. 5; that he and Vucovich belonged to the same crew or shift of men; that

''We had a man to stop us every night who told us to stay back and wait until the cars got up, and the motorman went back and shut off the switch. * * * He tries to hold us back, but we don't want to stay back, because if we do we will miss the first trip going up. * * * On this occasion when this man got killed * * * we heard the cars coming and we were all down, and there was a man there with us who tried to hold us back, and said, 'Don't come'; * * * the fellow, Jack Love, who was there with us in charge said, 'Stay back boys; wait.' We were waiting for the trip. At the time when the man got killed the motor was coming around over the switch.''

Pete Japuncich, another of plaintiff's witnesses testified on this point as follows:

''I had known Pero Vucovich * * * about five years. * * * I saw him on the day he was killed. * * * I saw Jack Love there that night, and have seen him there before. The only thing he does with the men when they are waiting for the man trip, just stop them until the trip gets ready for them, and then says, 'All right.' ''

Andrew Bone, a witness for defendant, testified:

''I saw the accident. * * * When we were rushing down to get on the man trip there was a foreman or 'Safety First' man there—Jack Love. He was telling us to keep back. * * * On this occasion Jack Love had given no signal when the men came down. He was swearing at us to keep back. * * * The night of the accident, Pero Vucovich was about two cars in front of me. That night he was told to keep back, he was among the crowd.''

Ralph J. Buxton, another witness for defendant, who was mine foreman at the time of the accident, testified in part as follows:

"Pero Vucovich and these other workmen, prior to the accident, were told about the wires being charged with electricity. I instructed them to always be careful of those wires, because it was loaded heavy with electric current. They were told to stay back there until the man trip was made up. I told Pero and these other workmen, prior to the accident, to stay back until the trip was made up. I told them that quite often, extending back a period of perhaps five months prior to the accident. That was repeated on more than one occasion during that period."

Thomas Foster, a witness for defendant, testified that at the time of the accident he was assistant mine foreman in the mine in question, and that:

"I gave instruction down there to the men, when Pero Vucovich was among them, in regard to holding back until the man trip was prepared. I told them to wait there until the man trip was gathered and that they were notified to come down. * * * When Pero Vucovich was among the men I have told them about the wires being dangerous. * * * Pero Vucovich was working in that mine when I went there. I had been there about four months when he got killed."

Another witness testified that, while Pero (deceased) was there:

"I heard the remark many times by the mine foreman and the assistant, both, to look out for the wires. About a week before the accident happened there was a man that came in contact with the wire, and Pero and I were standing together this night, and I told him those wires were dangerous and to look out for them."

Another witness who was present and saw the accident testified that:

"The night when the man [Vucovich] got killed we all were waiting up on top where we were supposed to wait, on Five Slope; and when we heard the motor come in we all got

up on our feet, and started to come down. * * * Jack Love was there with us. He tried to hold the boys back but we were too many against him, and he could not hold us.''

There is much more evidence in the record of the same import as the foregoing, none of which is disputed. This is, in effect, conceded. Counsel for plaintiff, in their printed brief, say:

''The facts in the case are comparatively simple. There is but little dispute or contradiction.''

The men, in boarding the man trip, were supposed to climb over the side of the cars. By entering in this manner, the men do not come in close proximity to the trolley wire which the evidence shows is suspended from the roof of the entry opposite from the side of the cars where the men enter them. In the rush and scramble of the men to get into the front cars of the man trip, occasionally one of them would enter by stepping on the bumpers and climbing over the end instead of the side of the car. The evidence shows that this was recognized by the men as a dangerous way of boarding the man trip when the trolley was charged with electricity, because it brought the party adopting it in close proximity to the trolley wire. Red Morris, plaintiff's principal witness, testified on this point, in part, as follows:

''I knew it was dangerous to step on the bumpers. Sometimes I did it myself, and I took a chance when I got on the bumpers of coming in contact with the wire.''

Another witness, who, the evidence shows was familiar with the mine and the equipment thereof, testified:

''Unless a man wanted to commit suicide, there was only one way of getting into the car—that is going over the side.''

Vucovich, instead of boarding the man trip on the occasion in question from the side—the usual and comparatively safe way—stepped on a bumper between the cars, and was in the act of climbing over the end of one of the cars when he slipped and fell against the live trolley wire, and received an electric shock from which he died a few hours later.

Counsel for plaintiff, in their printed brief, seem to contend, if we correctly understand their position, that there is

no evidence tending to show that Vucovich "slipped" when he stepped onto the bumper of a car on the occasion referred to.

William A. Hill, a witness for defendant, testified on this point as follows:

"Vucovich came in between this car I was in and the one ahead of me. * * * He was stepping up on the bumper and he slipped onto the wire."

On cross-examination the witness testified:

"The man was in the process of falling when I seen him slip. * * * I saw him slip. I couldn't help but see his feet. * * * I saw his feet go up, so I just naturally says he slipped."

Whether Vucovich slipped and fell, or fell against the car without slipping, is not of controlling importance. Practically all of the witnesses who saw the accident testified that the deceased, when he stepped on the car bumper, "fell."

We have examined the record with more than ordinary care, and are of the opinion that the only inference permissible from the facts under the present state of the record is that the company discharged every duty it owed to the deceased, under the contract of employment, respecting the matter alleged in the complaint as negligence. On the other hand, we are equally confirmed in our opinion that the only inference deducible from the facts in evidence, to which we have referred, which correctly reflects the record, is that Vucovich, at the time of the accident, and for a considerable period prior thereto, was familiar with the location of the trolley wire with reference to the car tracks and the cars at the place where he and his colaborers boarded the man trip, and that he fully understood and appreciated the dangerous character of the trolley wire when carrying a heavy current of electricity, and the probable fatal results to a person coming in contact with it. He must, therefore, under the circumstances, be held to have assumed these risks and hazards, all of which were obvious and presumably known to him. *Fritz* v. *Electric Light Co.*, 18 Utah, 493; 56 Pac. 90; 26 Cyc. 1236. Furthermore, Vucovich, on the occasion in question,

boarded the man trip prematurely, in violation of positive orders given, and in the face of emphatic protests made by the "Safety First" man. It seems that about the only thing the "Safety First" man could have done that he did not do to enforce his orders in that regard was to use physical force. This he was not required to do to relieve the company from liability for damages sustained by Vucovich or his colaborers because of their intentional and willful disobedience of orders. Shearman & Redfield, Neg. section 270b; 26 Cyc. 1267.

The deceased, also, of his own volition, boarded the man trip in a way recognized by the employees of the company (and under the circumstances presumably known to him) to be extremely dangerous and hazardous, instead of boarding it in the usual and customary way, which involved but little, if any, danger. It appears that he did this to avoid the probable inconvenience of waiting ten or fifteen minutes after the man trip arrived at the main slope before being taken out of the mine. He was, therefore, as a matter of law, guilty of negligence—negligence that resulted in, and was the proximate cause of, his death.

The law fixing liability under the circumstances indicated is tersely stated in Shearman & Redfield on Negligence, section 89, as follows:

"When the question is one of mere inconvenience, and not actual danger, some moderate risk may be taken, if there is no obvious danger. But the plaintiff will be chargeable with contributory negligence if he runs the risk of an obvious and serious danger merely to avoid inconvenience." *Fritz* v. *Electric Light Co.*, supra; *Bunker* v. *U. P. R. Co.*, 38 Utah, 592, 114 Pac. 764; Bailey Mast. Liab. p. 169; 26 Cyc. 1248.

The court instructed the jury "that, where a master maintains electric wires carrying a high or dangerous quantity of electrical energy, he is *bound to exercise the greatest care and prudence to prevent injury to his employees,*" etc. The company excepted to the giving of that part of the instruction which we have italicized, and, in particular, to the word "greatest."

It would seem, on first impression, that, in view of the disposition made of the assignment of error hereinbefore considered, this assignment is of no importance. But since

Appeal from Weber County, Second District

the judgment must be reversed and the cause remanded for a new trial, we shall briefly consider the assignment.

The law, as declared by the great weight of authority, is that the master's duty to his employees is performed by using ordinary care for their safety, and that "ordinary care" when applied to the duty of a master is that degree of care which ordinarily prudent and careful persons would ordinarily exercise under the same or similar circumstances. The greater the danger the greater the degree of care required to constitute ordinary care. In Words and Phrases, vol. 6, p. 5032, it is said:

"Ordinary care means just what the words say. It is defined by our courts all over the civilized world in plain terms and is this: Just such care as a reasonably careful and prudent man—not a cautious man, not an extraordinarily cautious man, but a reasonably careful and prudent man—would exercise under the circumstances then existing and surrounding him. * * * It is not the highest care, it is not extraordinary watchfulness, but such reasonable care as a man, under the circumstances, being reasonably prudent and careful, would exercise and ought to exercise."

In *Commonwealth Elec. Co.* v. *Melville,* 210 Ill. 70, 70 N. E. 1052, the court says:

"Ordinary care exercised by those who make a business of using it [electricity] for a profit, to prevent injury to others therefrom, requires much greater precaution in its use than where the element used is of a less dangerous character. As there is greater danger and hazard in the use of electricity, there must be a corresponding exercise of skill and attention for the purpose of avoiding injury to another, to constitute what the law terms 'ordinary care.' The care must be commensurate with the danger."

Attention is also invited to Words and Phrases, vol. 6, pp. 5029 to 5042 inclusive, and also to vol. 3 (N. S.) pp. 774 to 788, inclusive, where numerous authorities are cited and many excerpts from decisions, both state and federal, are quoted.

These authorities almost uniformly approve of the foregoing definition or construction of the term "ordinary care." While there are a few authorities that contain expressions which seem to approve of instructions couched in language similar to that excepted to in the instruction under considera-

tion, yet the great weight of authority seems to hold, and we think correctly, that the language here excepted to imposes a higher degree of care on the master than that described and defined as "ordinary care." *Missouri Pac. Ry. Co.* v. *Gibson,* 56 Kan. 661, 44 Pac. 612; *Watts* v. *Murphy et al.,* 9 Cal. App. 564, 99 Pac. 1104; *Sappenfield* v. *Main St., etc., Co.,* 91 Cal. 48, 27 Pac. 590; *Texas Cent. Ry. Co. et al.* v. *Lyons* (Tex. Civ. App.) 34 S. W. 362; *Van Blarcom* v. *Cent. R. Co.* (1916) 73 N. J. Law, 540, 64 Atl. 112; 3 Labatt, Mast. & Serv. section 907.

For the reasons stated, the judgment is reversed with directions to the lower court to grant a new trial. Appellant to recover costs.

FRICK, C. J., and CORFMAN, THURMAN, and GIDEON, JJ., concur.