KAUMANS v. WHITE STAR GAS & OIL CO. et al.

No. 5559. Decided December 16, 1936. (63 P. [2d] 231.)
Rehearing Denied July 26, 1937.

26

*Irvine, Skeen & Thurman* and *S. R. Thurman,* all of Salt Lake City, for appellant.

*D. N. Straup* and *A. J. Mays,* both of Salt Lake City, and *Leslie Frazer,* of Washington, D. C., for respondent.

EPHRAIM HANSON, Justice.

The plaintiff brought this action against defendants White Star Gas & Oil Company, a corporation, and Jack W. T. Pomeroy to recover for personal injuries suffered by him May 15, 1932, as a result of a gasoline explosion and fire. The cause was tried to a jury and resulted in a verdict in plaintiff's favor. The appeal to this court is prosecuted by defendant Pomeroy alone.

The assignments of error may be grouped under three headings: (1) Insufficiency of the evidence to sustain a judgment against defendant Pomeroy; (2) error in the admission and exclusion of evidence; and (3) error in failing to give and in giving certain instructions. The insufficiency of the evidence to sustain the verdict and judgment was raised by Mr. Pomeroy by a motion for a directed verdict and by a motion for a new trial. Both motions were denied by the trial court.

At the time plaintiff was injured the defendant Gas & Oil Company maintained a bulk gasoline plant at 203 West Thirty-Third South street in Salt Lake county and was engaged in wholesaling gasoline and oil. Pomeroy was the president and general manager of the company and had active management of its affairs. He also owned and operated a retail gasoline service station at 3180 South State street, a few blocks distant from the bulk plant. The Gas & Oil Company had no interest in this service station. Mrs. Pomeroy, wife of the defendant, also operated a retail gasoline service station situated on the same premises on which the bulk plant was located. She employed plaintiff as an attendant at this service station and he had been so employed about two years prior to the fire which occurred on May 15, 1932. The bulk plant was in charge of Ralph M. Carter, an employee of the Gas & Oil Company. He had complete charge of the wholesale department of the company and of the loading and unloading of gasoline and oil at the bulk plant, under the direction and supervision of the appellant

by a railroad spur. The tank cars would be placed or "spotted" at a certain point where the rails had been insulated and where the gasoline could be transferred by means of an electrical pump from the tank cars to a large storage tank. During all of the time plaintiff was employed by Mrs. Pomeroy it had been the practice for him to assist Carter in unloading the tank cars. At times Carter assisted plaintiff with his work at the service station. A pump house had been erected by the company a few feet from the storage tank, and a pump operated by an electric motor had been installed with proper connections so that the gasoline in the tank cars, after the cars had been "spotted" on the insulated portion of the track, could be pumped from the tank cars into the storage tank. This involved making certain hose and pipe connections, which connections plaintiff had been in the habit of making or assisting in making during his employment by Mrs. Pomeroy.

The electric motor which operated the pump was bolted to the floor in the pump house. It was a three horse power, as general manager of the company. The plant was serviced open brush type. The switch which was used in starting and stopping the motor was fastened on an inside wall of the pump house and was what is known as a "knife" switch. Neither the motor nor the switch was vapor proof. The motor emitted sparks from the brushes as it was running. The switch emitted sparks when thrown in or out. There was nothing to prevent gasoline vapor from entering into either the motor or the switch and being ignited by the sparks thus created.

None of the foregoing facts are in dispute. The plaintiff's evidence tended to establish the following facts: A tank car had been "spotted" at the bulk plant for unloading a day or two before May 15, 1932. On that day Carter drove a truck to the bulk plant, and he and plaintiff were about to unload the gasoline in the tank car into the storage tank. They had considerable difficulty in getting the dome of the tank car

unlocked because of the quantity of fumes that came out. When they got the dome open, the gasoline came out over the top of the car because of its great volatility. Pomeroy then appeared upon the scene. Plaintiff and Carter told him it was a peculiar gas and described it to him. Pomeroy then instructed Carter to get the "Chev" truck at Pomeroy's service station on State street, load it with gasoline direct from the tank car so as not to mix it with the gasoline then in the storage tank, and take it to his service station and mix it with the other gas he had there. He directed plaintiff to help Carter and to help make the connections, as there would be a number of them. Pomeroy then took Carter in his car to his service station, where Carter got the "Chev" truck and drove it back to the bulk plant.

The usual way to load the truck was to load the gasoline by gravity from the storage tank. Since Pomeroy had instructed them to load direct from the tank car, it became necessary to pump the gasoline into the truck. The truck had four compartments, one holding 200 gallons and the other three holding 100 gallons each. On the top of each compartment was a lid and at the bottom was an outlet. There was not enough hose to load into the top of the truck so they loaded by making a connection with each of the outlets in turn and forcing the gasoline into each compartment. Carter was in full charge and determined the method for loading the truck. Plaintiff had no voice in the matter. Carter would tell him what he (Carter) was going to do and how it was to be done, and plaintiff simply assisted him.

In loading the truck Carter stationed himself on top of the truck and plaintiff in the pump house to handle the switch. Carter would tell plaintiff when he was ready and plaintiff would throw in the switch. When the compartment was filled, Carter would tell plaintiff to throw out the switch. In this manner each compartment was filled. When the hose was disconnected from one compartment so as to connect it with another, there would be some gasoline in it which

would run out. This they collected in an open tub. Some gasoline spilled over the top of the truck by "boiling over." They filled the truck and then connected the pump to the storage tank. When everything was ready Carter told plaintiff to throw in the switch. Immediately upon throwing in the switch plaintiff saw a big bolt of fire come up from the motor. The gasoline became ignited and plaintiff was severely burned. Plaintiff's evidence also tended to show that a motor and switch such as were used would give off sparks and were not of the type that would pass either city or county inspection and were not reasonably safe for use where the atmosphere contained gasoline vapors which could come in contact with the sparks; that only motors of the inclosed brush type and vapor proof switches were approved by the city and county regulations and by the National Electrical Code.

Defendant Pomeroy's motion for a directed verdict was based upon the theory that plaintiff was responsible for the manner and method used in loading the truck, and that plaintiff himself was guilty of negligence in not using a hand pump which was provided and which would have been safe, but voluntarily chose to use the electrical equipment intended only for loading from the tank car into the storage tank, the use of which was unsafe and dangerous and constituted negligence; that the equipment provided by the Gas & Oil Company was reasonably safe for whatever use within the line of work that plaintiff was doing or might be required to do while on its premises. The same point is made by defendant in his assignment of error covering the trial court's refusal to grant a new trial because of the alleged insufficiency of the evidence to sustain the verdict and judgment. It will thus be seen that so far as the sufficiency of the evidence, under defendant's theory above stated, is concerned, defendant contends, first, that plaintiff himself was guilty of negligence, and, second, that the Gas & Oil Company had fully discharged its duty to plaintiff by providing

safe equipment and, therefore, defendant was free from negligence.

Upon the first proposition defendant invokes the rule that "when there are two or more methods or ways by which a servant may perform his duties, and he voluntarily chooses the most hazardous, knowing it to be such, he does so at his own risk." *Fritz* v. *Salt Lake & Ogden Gas & Elec. Light Co.,* 18 Utah 493, 56 P. 90, 93.

Defendant attempted to show that he had provided a hand pump to be used to load trucks direct from the tank cars and that this was the safe method of loading trucks, while using the electric equipment was more dangerous; that plaintiff's use of the electric equipment was, therefore, negligence as a matter of law.

While we do not dispute the rule thus announced in the Fritz Case, we are convinced it cannot be here invoked as contended by defendant. As stated in 39 C. J. 862:

"To render the rule operative against the servant it is necessary that all of the essential elements of the rule should be present. Thus, it must appear that a safe or reasonably safe method of doing the work was available to the servant, that he knew, or in the exercise of reasonable care should have known, of the existence of such method, that the selection of the unsafe method was voluntary on his part, that he knew, or was chargeable with knowledge of, the danger inhering in the method chosen, and that the danger was so imminent and threatening that a man of ordinary prudence would not have taken the chances of encountering it."

The evidence in this case falls far short of establishing as a matter of law the essential elements enumerated in the above quotation. The defendant testified that he had provided a hand pump to be used to load trucks from the cars, and had instructed Carter in its use for that purpose. It does not appear that defendant directed it to be used rather than the electrical pump because he thought the latter dangerous to use in loading from the car to the truck. There is no evidence whatever that Pomeroy or any one else had ever instructed plaintiff in the use and purpose

of the hand pump. However, there is evidence to the effect that this pump was portable and was not always at the bulk plant, but was taken aboard the trucks and used in delivering gasoline. There is no evidence that it was at the plant and available for use on the day of the fire or that plaintiff or Carter knew of its presence. The only time it had ever been used, to plaintiff's or Carter's knowledge, was once about a year previously when it was used to fill trucks from a car which had not been spotted so as to make the use of the electrical pump possible or the transfer of the gasoline into the storage tank possible. One of defendant's witnesses testified it was kept in what was known as the "can" house, where oil cans were kept. He also testified that there were 20 feet of hose in the can house which could be used on the hand pump. This house was burned by the fire and was seen by this witness the day after the fire. He then saw this hose there, but he did not testify as to any pump being there. A fair inference is that it was not there. It cannot be said, therefore, as a matter of law, that on the day in question the Oil & Gas Company had supplied equipment other than the electrical pump for transferring the gasoline from the car into the truck. Nor can it be said that plaintiff was guilty of negligence as a matter of law in using the equipment that was there in the manner in which it was used, assuming plaintiff was responsible for the method used in loading the truck. There was evidence that Pomeroy directed Carter to load directly into the truck; that there was not enough hose to load through the top of the truck; and that the only way the truck could be loaded was by the method actually used. There is some testimony also that Pomeroy himself directed the use of this method.

In *Swansea Lease, Inc.* v. *Willison*, 28 Ariz. 581, 238 P. 389, 390, the rule here contended for by defendant was sought to be applied through a requested instruction. We quote as follows:

"The requested instruction, to the effect that if an employee selects a dangerous way of performing his duty when there is a safe one

apparent to him, and is injured in consequence thereof, he cannot recover, stated as an abstract proposition, and in the absence of qualifying circumstances, is correct. But to justify such an instruction in a particular case it must fairly appear from the evidence: First, that the way used is unreasonably dangerous for a prudent man under all the circumstances; and, second, that a safer way is presently available and not merely theoretically possible."

See, also, *Ernst* v. *Union Depot Bridge & Term. Ry. Co.* (Mo. Sup.) 256 S. W. 222; Labatt's Master and Servant, vol. 3, § 1249.

It is clear, also, from the evidence that plaintiff did not select the method used. His superior, Carter, selected the method, and Carter was in complete charge of the work thus being done. The essential element of voluntary choice is missing. *Henson* v. *Pascola Stave Co.*, 190 Mo. App. 471, 177 S. W. 787; *Ramm* v. *Hewitt-Lea Lumber Co.*, 49 Wash. 263, 94 P. 1081.

We are likewise of the opinion that the evidence fails to establish as a matter of law that plaintiff was negligent in obeying defendant's orders because of the danger necessarily involved in the work ordered done. It is well settled that a servant is not negligent in obeying the directions of his employer or superior unless the danger involved was " 'so absolute and imminent that injury must almost necessarily' have resulted to him by following" such directions. *Toone* v. *J. O. O'Neill Const. Co.*, 40 Utah 265, 121 P. 10, 16; *Fowler* v. *Union Portland Cement Co.*, 39 Utah 363, 117 P. 462; *Pascoe* v. *Nelson*, 52 Mont. 405, 158 P. 317; *Storey* v. *Williams Bros., Inc.* (Mo. App.) 50 S. W. (2d) 698. The mere fact that the servant was aware that he was exposing himself to danger does not make him guilty of contributory negligence. *Toone* v. *J. O. O'Neill Const. Co.*, supra; *Neitzke* v. *Kraft-Phenix Dairies, Inc.*, 214 Wis. 441, 253 N. W. 579.

It should be remembered, also, that the work being done by plaintiff, as far as method was concerned, was unusual

and was necessitated by the peculiar character of the gasoline being unloaded and the desire expressed by defendant to load the truck with gasoline before it became mixed with the gasoline already in the storage tank. The work was being done under the personal direction and supervision of Carter, who had full charge of such operations. Under all the facts of the case the question of plaintiff's negligence was one for the jury and not one of law. *Russell* v. *Borden's Condensed Milk Co.*, 53 Utah 457, 174 P. 633; *Baker* v. *J. H. Hudson Drilling Co.*, 149 Okl. 180, 300 P. 386; *Arizona Cotton Oil Co.* v. *Thompson*, 30 Ariz. 204, 245 P. 673.

To meet plaintiff's charge of negligence, defendant sought to show that the electric equipment was of the same type and standard as was generally in use at bulk plants, relying on the legal proposition that such common usage is conclusive evidence of ordinary care. Defendant now urges that the evidence conclusively establishes such general usage, and relies upon *Fritz* v. *Salt Lake & Ogden Gas & Elec. Light Co.*, supra, and *Whalen* v. *Union Pac. Coal Co.*, 50 Utah 455, 168 P. 99. The Whalen Case does not support the rule contended for by appellant. It requires that the appliances, etc., in addition to being the same as are in common use by others engaged in the same business, be reasonably safe and suitable for the purposes for which they are intended and the use to which they are applied. See, also, note to 68 A. L. R. 1439.

An examination of the evidence shows there is some conflict as to whether the type of equipment used by plaintiff was the type generally used. However, we do not think that the rule contended for by defendant has any application to the facts of this case for the very plain reason that the use made of the equipment on the particular occasion in question was not shown to be a use to which such equipment was ordinarily and customarily put by others in the same business or by the Gas & Oil Company itself. It is admitted that plaintiff had never used the electric pump to transfer

gasoline from a tank car to a truck; that this was a new use and a new method as far as his knowledge went. There is no evidence that this equipment had ever been used to transfer gasoline from a tank car to a truck. Indeed, defendant strenuously asserts that the evidence conclusively shows that plaintiff's use of the equipment was unusual and improper. Under such conditions the kind of equipment used by others would be wholly immaterial. It becomes, rather, a question as to whether the master can be considered negligent in failing to furnish safe and proper equipment as applied to such new use, conceding that it was safe and proper for the purposes originally intended. *Compton* v. *Louis Rich Const. Co.*, 315 Mo. 1068, 287 S. W. 474. On this question the rule is stated by Labatt on Master and Servant, § 923, as follows:

"If new functions are imposed upon an instrumentality by the master himself or his representative, and the servant is thereby exposed to undue risks, the master must answer for any injury resulting from those risks, and cannot excuse himself by showing that the instrumentality was a suitable one for the performance of the work for which it was originally supplied. The master's acquiescence in the use of an appliance for some purpose other than that for which it was intended puts him in the same position as if the appliance had been originally furnished for that purpose."

See, also, 39 C. J. 441, 442; *Wood* v. *Bichler Mfg. Co.* (Mo. App.) 208 S. W. 481; *Babcock Bros. Lumber Co.* v. *Johnson*, 120 Ga. 1030, 48 S. E. 438.

The evidence in this case is without conflict that Carter had complete charge and supervision of the operations and of the work being done by plaintiff, and is sufficient to warrant the conclusion that the master must be held to have contemplated and authorized the use which was made of the electrical equipment by Carter so as to invoke the foregoing rule.

Defendant contends, however, that as to him there was no evidence of negligence, since he did not personally participate in the work and the equipment used belonged to

the Gas & Oil Company; that defendant was only an officer of the corporation, and Carter was not in his employ but was acting solely for the corporation. Defendant has cited many authorities on the proposition that as an officer of the corporation he is not liable unless he participated in the tort in some manner. The contention of defendant may be conceded, but we are of the opinion that it has no application here. The case was not tried nor submitted to the jury on any theory that defendant was responsible because he was an officer of the Gas & Oil Company. Nor was the theory that defendant was using the corporate structure as a means of conducting his own private business and that the corporate entity should be disregarded ever advanced in the trial of the case.

In our opinion defendant's personal liability attaches by reason of the fact that he personally had an interest and participated as an individual in the operations in the course of which plaintiff received his injuries, and by reason of the fact that as the managing officer of the Gas & Oil Company, he assumed and owed the duty of providing reasonably safe and suitable equipment for the filling of the truck with gasoline from the tank car, and of making certain that the equipment which was used by plaintiff and Carter under the directions of Carter was reasonably safe, suitable, and proper for the use to which it was applied. It is admitted that defendant operated a retail service station on State street; that he took Carter to his service station to get a truck for the purpose of transporting 500 gallons of gasoline from this particular tank car to his service station to be mixed with the gasoline he there had. There is no evidence at all that he ordered 500 gallons of gasoline from the company as a customer might do in the regular course of business. The decision to transport this gasoline to his service station came about because of its peculiar tendency to "boil over" and his desire to obtain 500 gallons to mix with the gasoline he already had. Apparently both he and the company were to be benefited by this transfer of

gasoline. The company without his consent could not transfer 500 gallons of gasoline to his tank, nor could he rightfully take the gasoline without the consent of the company, and neither would have participated had it not been by their mutual assent and advantage. Under the evidence it is impossible to say wherein or to what point he was representing the Gas & Oil Company exclusively and wherein or to what point he was acting for himself as owner of the service station. That he was acting for himself individually as well as for the company is clear. Under the evidence a finding that Carter was acting for both defendant and the Gas & Oil Company would be well sustained, as the defendant was directing what was to be done both as it affected the company and as it affected himself as the owner of the service station. *H. D. Watts Co.* v. *American Bond & Mortg. Co., Inc.*, 272 Mass. 84, 172 N. E. 240. It seems to us that in this particular transaction he and the company were engaged in a joint enterprise, were mutually co-operating in the matter of transferring the gasoline from the tank car to the defendant's service station as a matter of convenience and benefit to both. This court has held in *Forbes* v. *Butler*, 66 Utah 373, 242 P. 950, that a joint venture is in the nature of partnership and subject to the law of partnership so far as the substantial rights of the parties are concerned. The rule as to joint liability is stated in 33 C. J. 873 as follows:

"Joint adventurers who are engaged in an enterprise requiring the use of mechanical contrivances are jointly and severally liable as joint tort feasors for personal injuries suffered by others from the negligent installation or operation thereof, or from the negligence of their agents and employees acting within the scope of their employment."

See, also, *Bonfils* v. *Hayes*, 70 Colo. 336, 201 P. 677; *Hackney* v. *Dudley*, 216 Ala. 400, 113 So. 401; *Keiswetter* v. *Rubenstein*, 235 Mich. 36, 209 N. W. 154, 48 A. L. R. 1049; *Ellingson* v. *World Amusement Service Ass'n*, 175 Minn. 563, 222 N. W. 335; *New York, C. & St. L. R. Co.* v. *Kistler*,

66 Ohio St. 326, 64 N. E. 130. It follows, therefore, that any negligence of the Gas & Oil Company in providing defective or improper equipment for the performance of this particular operation must be considered as defendant's negligence as well.

The appellant, as president and general manager of the company in general control and supervision of its business and activities, selected the electric motor and switch and had them installed, and was acquainted with the fact that they were not vapor proof. He assumed the duty for the company of purchasing and installing the equipment, and was familiar and acquainted with it, and knew or should have known that it was not reasonably safe and suitable for the use to which it was applied by the plaintiff and Carter. The rule approved by the great weight of the authorities is to the effect that where the managing officer of a corporation could by the exercise of ordinary care have ascertained the unsafe condition of an appliance furnished by the corporation and used by an employee under the direction of such managing officer, the latter is personally liable for injuries resulting to such employee therefrom. The following authorities, as well as many others including authorities cited by appellant in his brief, support this rule: *O'Neil* v. *Young & Sons' Seed & Plant Co.*, 58 Mo. App. 628, 12 Century Digest (Corporations) 1463, § 1454; *Hagerty* v. *Montana Ore Purchasing Co.*, 38 Mont. 69, 98 P. 643, 25 L. R. A. (N. S.) 356; *Ward* v. *Pullman Co.*, 131 Ky. 142, 114 S. W. 754, 25 L. R. A. (N. S.) 343; *Brower* v. *Northern Pac. Ry. Co.*, 109 Minn. 385, 124 N. W. 10, 25 L. R. A. (N. S.) 354; note, 25 L. R. A. (N. S.) commencing at page 343; *Lough* v. *John Davis & Co.*, 30 Wash. 204, 70 P. 491, 495, 59 L. R. A. 802, 94 Am. St. Rep. 848; *Greenberg* v. *Whitcomb Lumber Co.*, 90 Wis. 225, 63 N. W. 93, 28 L. R. A. 439, 48 Am. St. Rep. 911; *Mayer* v. *Thompson-Hutchison Bldg. Co.*, 104 Ala. 611, 16 So. 620, 28 L. R. A. 433, 53 Am. St. Rep. 88.

In the case of *Lough* v. *John Davis & Co.*, supra, the court quotes from Mechem on Agency, and then makes the following statement:

"so that it will be seen that, even according to Mr. Mechem, a lack of care and a lack of precaution, when once the duty is assumed, are as much misfeasance as an active misdoing. The irresistible logic of his statement is that the agent is responsible to third persons when he is negligent in the performance of the duties which he undertakes, whether such act be termed misfeasance or nonfeasance."

We are of the opinion that there was sufficient evidence of negligence on the part of defendants, arising out of a failure to provide safe and proper facilities for pumping gasoline on the particular occasion in question, to warrant a submission thereof to the jury and, thus, in the circumstances of the case, we do not feel ourselves at all justified to disturb the jury's finding in that regard.

Appellant assigns as error the refusal of the trial court to permit different witnesses to answer certain questions. Many of the questions were directed to the matter of showing that the facilities provided for pumping gasoline were of the same type and standard as were generally in use by others in the same business, or that the facilities had never before been used in the manner they were used on the occasion in question, or what the usual method of unloading a tank car was. Our views already expressed dispose of these assignments adversely to defendant without the necessity for further comment.

Defendant asked Carter concerning the presence and the length of hose that might have been available so that a different method of loading the truck could have been used. The trial court sustained plaintiff's objections to these questions. We think the court committed no error. Carter was in complete charge of the operations and selected the method used. His selection of an improper method could not affect plaintiff's rights as against defendant, for, as heretofore indicated, defendants must be held

under all the facts of this case as having contemplated and authorized the actions of Carter to whom they had given full and complete charge and supervision of the work being done.

On cross-examination of Carter, the court permitted plaintiff's counsel to ask the witness if he held a judgment for about $12,500 against the White Star Gas & Oil Company. The witness answered that he did not; that it had been paid. Defendant Pomeroy assigns this as error. The objection to this question came after the answer was given and was made by Pomeroy alone. Defendant concedes that it might be permissible to ask whether Carter held a judgment against the White Star Gas & Oil Company as bearing upon his interest. If that be conceded then the amount of that judgment would also be pertinent as bearing upon the extent of his interest. However, we do not see how this testimony could be so prejudicial to defendant Pomeroy as to require us to so far interfere with the trial court's discretion in permitting this kind of cross-examination as to bring about a reversal. The jury might well have assumed from anything elicited by this question that since a judgment had been obtained against the company alone and it had been paid, it had been decided that Pomeroy was not responsible for Carter's injuries and so was not responsible for plaintiff's injuries. In addition, the evidence did not disclose that the judgment for $12,500 grew out of or was in any way connected with the accident in which plaintiff was injured. The trial court sustained an objection to the question as to whether or not Carter was injured in the same accident.

Defendant assigns as error the trial court's refusal to give four requested instructions. The first was a request for a directed verdict. The second and third related to defendant's position that a hand pump had been furnished. Our views heretofore expressed sufficiently dispose of these assignments. The trial court committed no error in refusing to give these requested instructions. The

fourth request contained a definition of contributory negligence. The instructions given by the court sufficiently covered this phase of the case.

The instructions of the court to which defendant took exception relate mainly to a statement of defendants' duty to plaintiff in respect to warning him of the dangers involved and providing reasonably safe appliances and equipment and to placing before the jury the question of defendants' negligence under the facts of the case, as well as plaintiff's negligence in failing to use the hand pump, if they found one had been provided. We are satisfied that under the views herein expressed no prejudicial error can be found in the giving of these instructions. The instructions as a whole fairly and adequately presented the cause to the jury.

Finding no error as presented by the record before us, we conclude that the judgment of the lower court should be, and it hereby is, affirmed, with costs to respondent.

ELIAS HANSEN, C. J., and MOFFAT, J., concur.

WOLFE, Justice (dissenting).

I dissent. This is an appeal of Pomeroy alone from a personal judgment against him. I cannot see how he is liable under any theory. It is freely conceded that the corporation is liable only on the theory of respondeat superior. Some human being for whose conduct the corporation is responsible has been guilty of negligence while acting for the corporation. But which human being's negligence, if any, is the corporation responsible for? We may grant for the purpose of the argument that there was such negligence for which plaintiff could shift the responsibility to another. Carter was in charge of the operation of unloading. It was one of his regular duties. He usually transferred the gasoline to the storage tank. This time he was given instructions to unload in the "Chev" truck. This instruction was given to Carter by Pomeroy, who was president and general manager of the defendant corporation. It was not given to the

plaintiff. Pomeroy did not tell Carter or the plaintiff to unload in the manner they did. Very infrequently was gasoline unloaded from a spotted tank car to a truck, but Carter testified that when it was it was done by the hand pump and that Pomeroy about a year before had told him how to do it. There is not an iota of evidence that Pomeroy told Carter or Kaumans to unload with the motor pump. Evidence of Kaumans' testimony before the Industrial Commission was introduced in which Kaumans appears to answer a question by Pomeroy at that hearing to the effect that Pomeroy had told Carter to unload in the manner they did, but when this testimony is taken with Kaumans' other testimony it is quite apparent that he meant that Pomeroy had given orders to unload the gas from the tank car into the truck and not that he gave instructions as to the manner of unloading. Furthermore, this testimony was introduced on cross-examination to show an inconsistency between Kaumans' statement before the commission and his statement on the stand in order to affect credibility. It was hearsay except for that purpose. Kaumans testified that it was Ralph (Carter) who made the suggestion that they make the hose connection from the pump to the outlet taps of the tank truck. Carter testified that he and Kaumans made it that way because the hose length was too short to go to the top inlets of the tank truck. From Kaumans' testimony it can be gotten that Pomeroy was not present when such connections were made. Therefore, it must be taken that the undisputed facts are that Pomeroy had given no instructions to unload in the manner which Carter and plaintiff did unload and that Carter was familiar with the manner in which gasoline should be unloaded when it was to go into a tank truck. Therefore, the corporation defendant must respond because of the negligence of its servant Carter unless the general manager as an agent of the corporation had a positive duty to instruct at that time concerning the manner in which the gas was to be unloaded. The prevailing opinion itself states:

"The work was being done under the personal direction and supervision of Carter who had full charge of such operations."

And again:

"The evidence in this case is without conflict that Carter had complete charge and supervision of the operations and of the work being done by plaintiff, and is sufficient to warrant the conclusion that the master must be held to have contemplated and authorized the use which was made of the electrical equipment by Carter so as to invoke the foregoing rule."

If it is conceded that Carter's use of the electric motor pump in unloading in the manner he did was negligence and that Kaumans cannot be held to have been familiar with the risk involved because it was not such that its dangerous nature could be said to be apparent, and if we further concede that a second and safer method was not readily available (a conclusion not free from doubt), we have a chain running from Carter back to the corporation which links the corporation to Carter's negligence and makes it liable provided it can be held that in the use of the electric motor pump under these circumstances, Carter was acting within the scope of his authority. We need come to no conclusion as regards any of these elements in this appeal because the corporation is not a party to the appeal. The chain through which the defendant corporation can be connected with the injury to Kaumans is set out merely for the purpose of showing that Pomeroy is not a link in it, since he gave no orders to unload in the manner which Carter used. And Pomeroy cannot be a link in another chain of cause and effect relied upon by plaintiff, to wit, the failure of the corporation to provide a safe means of doing the job or, put in the affirmative way, the corporation's providing an unsafe equipment for doing the job. In the first place, the electric motor pump was apparently not an unsafe apparatus for transferring gasoline from a tank car to the storage tank. Vernon Sharp did testify for plaintiff that in the manner the electric pump was set up it was not safe for pumping

gas, but several other witnesses testified that it was reasonably safe and two years of experience by the company in using it to transfer from tank car to storage tank about a hundred times showed it to be reasonably safe. It was only when it was used in the peculiar way it was used on this occasion, that is, when the tank truck was placed within a few feet of the pump house and gas allowed to spill from the outlets of the truck and thus impregnate the atmosphere in the pump house with a highly volatile brand of gas, that it was really dangerous. It is therefore only on the theory that Carter, acting for the corporation chose *for this method of transferring gas* a dangerous or unsafe piece of equipment (but safe for the purpose for which it was furnished) that the corporation can be held. But in this chain of the choosing of said unsafe equipment down to the effect finally produced on Kaumans, Pomeroy is not a link. And even if he were a link in that he may have omitted a duty to instruct on this occasion *not* to use the motor pump, I am hardly, at this juncture, prepared to say that such omission would make him personally liable. I doubt whether as general manager or president he had such a duty especially since Carter was charged with the duty of conducting the operation of unloading. If a general manager of a corporation gives orders that a certain operation is to be performed in all the plants of the corporation and a foreman uses wrong equipment or uses the equipment wrongly when he knows such equipment should never be used for such operation or in such manner and was previously instructed as to what equipment to use and how to use it, is the general manager personally responsible? I think not. Pomeroy can be considered a link in the chain between first cause and final effect only on the theory that he had a positive duty to instruct *not* to use the motor pump to load in the tank truck. The opinion places Pomeroy's personal responsibility for negligence (1) on some theory that he was acting individually for himself as well as for the company, and (2) on the theory that he had failed to provide, as managing officer

of the corporation, reasonably safe and suitable equipment for filling the tank with gasoline and of "making certain that the equipment used by plaintiff and Carter under the direction of Carter was reasonably safe, suitable and proper for the use to which it was applied." To these theories I am unable to subscribe. In regard to the first theory the gas in the tank car belonged to the corporation. It was the corporation's duty to unload it. It was unloaded by Carter as a servant of the corporation in a tank truck by instructions of Pomeroy, general manager of the corporation. Certainly up to this point it must be conceded that Pomeroy was acting for the corporation and not for himself. Up to this point he was doing the necessary and required business of the corporation. How then does he suddenly become transferred into a person acting for himself? It is said because the gas went to his own retail service station. Let us suppose that Pomeroy did not have a service station but the company had a customer or Pomeroy had a friend who was not a customer who ran one. A peculiar type of gasoline comes in. Pomeroy wants to test it out mixed with other gas before the company mixes it with the gas in the storage tank. He gets the customer or his friend to consent to put 500 gallons of it in the retail station tanks. Can it be said to be a benefit to such customer or friend, or, if a benefit, that such customer or friend would be liable? Now, because Pomeroy happens to own his own station and sends it there, can it any the more be said that by such act he ceased to act as agent of the corporation or that he was then acting for himself as well as the corporation? He simply gives his own consent, using his station to test it out *for* the *corporation*. Of course, if it is designed to hold Pomeroy at all hazards, such rationalizing rather than reasoning would have to be indulged in. The sending of Carter for the truck to Pomeroy's service station was a corporate act. The opinion says: "Apparently both he and the company were to be benefited by this transfer of the gasoline." What evidence this statement is based on, I do not see. But suppose it were so. Sup-

pose in the illustration above given the customer or friend was to be benefited. Am I to understand that the law we are to lay down in this State is that when anyone is benefited by the act of an agent of a corporation such benefited person becomes liable for the negligence of such agent if there is any negligence in the chain of events leading up to the final benefit? And am I to understand that if the agent acting for the corporation incidentally benefits himself without in any way violating his trust that such agent becomes liable personally for negligence which is the corporation's? I have previously endeavored to demonstrate that Pomeroy is not in the chain of events wherein the negligence occurred. It is not shown that it was his duty to instruct specially as to how to transfer the gasoline or to see that a hand pump or sufficient length of hose was provided or to anticipate that Carter and Kaumans would carry on with the motor pump. An officer and general manager has no duty to attend to every detail in person.

We come to the second theory above set out, that Pomeroy as managing officer had *assumed* and owed the duty of providing reasonably safe and suitable equipment for filling the truck and *of making certain* that the equipment which was used by plaintiff and Carter under the directions of Carter was reasonably safe, suitable, and proper for the use to which it was applied. Granted that there is evidence that there was no hose of sufficient length available and granted that plaintiff was as a matter of law not negligent in obeying orders because of the danger necessarily involved in the work done—both of which I concede—yet, where is there any foundation for the theory that Pomeroy had the personal duty as managing officer to see that there was delivered to Carter safe equipment for the loading from the tank car to the truck or that he "assumed" or owed the duty or that he had assumed or owed the duty of making certain that the equipment used was safe? There is undisputed evidence that Carter had charge of this unloading; that he had done it before and knew how to do it, and had done

it by loading in the top of the truck with a long hose. Is it now the law of this State that every managing director of every corporation, when he gives an order to the foreman of a shop or the superintendent of a plant to do a certain act, knowing that such foreman or superintendent has once been provided with proper equipment and that he knows the safe way to do it, has assumed the duty of making certain that the foreman or superintendent or a still further inferior officer or employee is going to use the proper equipment to carry out the order that comes from him or he will be personally liable? The facts of this case are that Carter had charge of these operations and that he had done this work before. Carter was the employee who had the duty to see that the equipment which he knew should be used was used, and his negligence in that regard is attributable to the corporation, but, as before remarked, Pomeroy is not a link in the chain of respondeat superior. Pomeroy gave the general order to his lieutenant who was already schooled and instructed how to do the loading in this particular case. There is no competent evidence, despite the prevailing opinion, that Pomeroy directed the method. Certainly, unless Pomeroy told Carter to do it in the fashion Carter did, or in some way assumed the duty to make certain that Carter did it the way he knew he should do it, Pomeroy is outside the chain of delict. I cannot see that there is any evidence that he in this case assumed or owed the duty toward plaintiff to see that Carter did it in the way he had been formerly doing it or that he assumed and owed the duty to make certain that Carter did it in that way. If so, every officer of a large industrial corporation may assume by a general order to do a certain work the duty to see that every step in that work is safely done and safe equipment used, or himself be personally liable.

The court's opinion seems also to hold the act of selection of the electric motor and switch by Pomeroy as the act of negligence. I have real difficulty in fastening on the real theory on which the prevailing opinion founds itself. It

was not this act of selecting and installing which caused the accident. . That apparatus had been used for two years in the ordinary fashion without mishap. It was the *manner* in which this equipment was used in the operation of this work which caused the accident. If a manager installs apparatus safe for one sort of use and some other employee on his orders to do a certain piece of work, without his knowledge uses this equipment wrongly or in a wrong manner when he had been instructed what to use in that work, is such officer who selected and installed the equipment for another purpose responsible? The cases cited in the opinion are those in which the managing director knew or should have known that the equipment provided for a *certain* use was unsafe for that use. They are not cases where it was held that a managing director was liable for the negligence of an underling who used equipment safe for the purpose for which it was provided, in a wrong manner or for a different use, when such underling knew or should have known that he should not have so used it.

I am also of the opinion that the court erred in refusing to permit Carter to testify as to whether he "ever loaded the tank truck by that method before." The question was material in determining whether the company had countenanced such practice in the past. I am of the opinion the court should have permitted the witness Carter to answer as to his knowledge of the length of a certain piece of hose. The matter of whether the gasoline was required to be transferred through the tank wagon outlet instead of through the intakes at the top because of insufficient hose length was material. Moreover, the distance the tank truck could be kept away from the pump house was also material. This depended on the length of hose available. For these reasons, the court should also have permitted the witness to answer as to whether he looked to see whether there was hose on the trucks or storage tank. It is true that if Carter had not looked for such hose or availed himself of its use had he known of its whereabouts, the company might still be

liable for his negligence as far as Kaumans was concerned, but it would have served to eliminate the effect of the negligence charged, to wit, that the company had provided unsafe equipment because the motor pump might have been reasonably safe with sufficient hose length even when used to load the tank truck. And it would have been material in tending to absolve Pomeroy from any omissions which as an agent of the company might have made him personally liable as well as the company. Of course, if the view of the court's opinion is to prevail that Pomeroy's personal liability comes by virtue of his benefiting as a retail dealer and not by virtue of his "agencial" relation to the corporation, none of these questions was material as to him. But the trial court would hardly know that such was the law for the very reason that it is not the law, unless we say it is.

For the above reasons I dissent.

FOLLAND, Justice (dissenting).

I concur in the views expressed by Mr. Justice WOLFE in his dissenting opinion.